OPINION
{¶ 1} Defendant-appellant, Stephen L. Hughes, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of (1) aggravated burglary in violation of R.C. 2911.11, (2) kidnapping in violation of R.C.2905.01, (3) abduction, the stipulated lesser included offense of kidnapping, in violation of R.C. 2905.02, and (4) two counts of violating a protective order or consent agreement in violation of R.C. 2919.27. Because the sufficiency and manifest weight of the evidence support the trial court's judgment, but because the trial court's sentence violates the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, we affirm in part and reverse in part.
 {¶ 2} By a ten-count indictment filed on January 7, 2005, defendant was charged with one count of aggravated burglary, two counts of kidnapping, two counts of attempted murder, two counts of felonious assault, two counts of violating a protective order or consent agreement, and one count of menacing by stalking. Prior to trial, the state dismissed the two counts of felonious assault. The jury found defendant not guilty of both counts of attempted murder and the menacing by stalking charge and guilty on the remaining offenses, including abduction, the lesser included offense of one of the two kidnapping counts. The trial court sentenced defendant accordingly. On appeal, defendant assigns three errors:
1. The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution, as the prosecution failed to offer sufficient evidence to prove beyond a reasonable doubt each and every element of kidnapping.
2. The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by finding Appellant guilty of kidnapping, as the verdict was against the manifest weight of the evidence.
3. The trial court erred and thereby deprived Appellant of his right to a jury trial as guaranteed by the Sixth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution when it imposed the sentence in this case.
I. First and Second Assignments of Error
 {¶ 3} Defendant's first and second assignments of error challenge the sufficiency and manifest weight of the evidence regarding his kidnapping conviction. Specifically, defendant contends the state "failed to offer sufficient evidence as required by R.C. 2905.01(A) that Appellant restrained Barbara Hughes with purpose either (1) to commit the offenses of attempted murder or felonious assault or (2) to terrorize or inflict serious physical harm on Ms. Hughes." (Defendant's Brief, at 4.) Similarly, in his argument regarding the manifest weight of the evidence, defendant asserts "the evidence presented at trial failed to establish that appellant had the purpose to terrorize Barbara Hughes as required by R.C. 2905.01(A)(3)." Id. at 7.
 {¶ 4} Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386. Sufficiency is a test of adequacy. Id. We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 5} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict to permit reasonable minds to find guilt beyond a reasonable doubt. Conley, supra; Thompkins, at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury thus may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill
(1964), 176 Ohio St. 61, 67.
 {¶ 6} R.C. 2905.01 provides that "[n]o person, by force, threat, or deception * * * shall * * * restrain the liberty of the other person" with the purpose to "facilitate the commission of any felony or flight thereafter" or to "terrorize, or inflict serious physical harm on the victim or another." "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). The second count of the indictment, the subject of defendant's first and second assignments of error, alleged that defendant "did, by force, threat, or deception, restrain * * * Barbara Hughes of her liberty, with the purpose to facilitate the commission of a felony, to wit: Attempted Murder * * * and/or to terrorize, or inflict serious physical harm on the said Barbara Hughes, or another."
 {¶ 7} According to the state's evidence, after 25 years of marriage, Barbara Hughes filed a complaint for divorce against defendant on March 1, 2004. Because of defendant's anger and erratic actions, she sought a protective order in April 2004. Between April and December of that year, charges were filed six or seven times against defendant for violations arising from defendant's continuing to phone or visit the marital residence. Defendant pleaded guilty to some of the charges and as a result was incarcerated for a period of time. Even after the convictions, the phone calls continued. Near the end of December, just before New Year's Eve, defendant failed to appear for a sentencing, and a warrant was issued for his arrest. The next day, Barbara received 20 to 30 hang-up calls. On January 1, 2005 defendant called to talk to their daughter Elizabeth ("Beth").
 {¶ 8} On Sunday, January 2, 2005, at about 6:00 to 7:00 p.m., Barbara was going to take the dog for a walk when the electricity went off and, with it, the lights in the house. Barbara stepped out the front door to see if the neighbors still had electricity and lights. As she was closing the door, defendant plowed through the door and pushed into the home. According to Barbara, defendant, yelling and screaming, pushed her against a wall, broke the glass in the picture behind her, put his hands around her neck and tried to choke her. While strangling her he said, "Bitch, I'm going to fucking kill you." (Tr. 117.) When he let go for a minute she yelled for their daughter Beth to call the police.
 {¶ 9} Beth, who had been in the bathtub, yelled from the upstairs, "Dad you're not allowed to be here." (Tr. 119.) With that, defendant turned and ran up the steps. Barbara ran behind defendant because she was afraid he would take Beth out of the house. When she came up behind him, defendant had his arms around Beth, shoving her around. Barbara tried to grab defendant to get him off Beth, and he instead came after Barbara. According to Barbara, he knocked her onto the bed, held her down around her neck, and hit her. While doing so he said, "I'm going to fucking kill you. Why the hell are you doing this? I'm going to tie you up." (Tr. 120.) He told Beth, "I'm going to tie you up with duct tape and then I am going to kill your mother and then I am going to kill you." (Tr. 121.) A photo of the room shows a roll of duct tape in Beth's room that was not there prior to the altercation.
 {¶ 10} Beth tried to fight defendant off of her mother, yelling and cursing at him. After six or seven minutes she said, "Dad, I have a knife." (Tr. 122.) He said he did, too, and a struggle ensued. Barbara ultimately kicked him hard enough that he stumbled back. Barbara screamed very loudly because she was sure defendant would stab her. Police then arrived, took defendant into custody, and, with defendant's assistance, returned electrical power to the house.
 {¶ 11} Beth testified similarly. According to Beth, on the evening of January 2, 2005, she and her mother were at home when the lights went out while she was taking a bath. Beth jumped out of the tub, grabbed a towel and went to the top of the stairs. She could see shadows downstairs, and based on her mother's screaming, she was sure something was happening. Reasonably sure that defendant was in the house Beth screamed, "Get off my mom, get off." (Tr. 305.)
 {¶ 12} Defendant seemed like he was trying to come upstairs, so Beth ran to her bedroom and called 9-1-1 from the phone in her room. She did not speak with the 9-1-1 operator, as she either dropped the phone or defendant took it away from her. By then, her mother also was in the bedroom, and defendant had pushed her mother down onto the bed. Beth tried to get him off her mother, trying to push him away. Defendant was saying "[s]omething like: I'm going to kill you. He was telling my mom that she ruined his life, stuff like that." (Tr. 308.)
 {¶ 13} Beth retrieved a pocket knife from her nightstand, opened it, and said "Get away from my mom, I have a knife." Id. Defendant responded, "That's okay, I have a knife too. * * * I have a knife and I have duct tape and I'm going to kill you both." (Tr. 308-309.) Defendant tried to take the knife away from Beth and to keep her away; Beth did not want to leave because she "didn't want to lose [her] mom." (Tr. 310.) Beth tried to call 9-1-1 from her cell phone in the bedroom, but she dropped it, prompting defendant to try to slam it with his foot. Defendant kept trying to push Beth away from her mother; when her mother was able to get up, defendant again tried to push Barbara down. Beth testified the ordeal seemed like it went on forever, but then she saw light come up the stairs and realized the police had come. Beth testified the duct tape depicted in one of the exhibits was not there before defendant came that night. As a result of the encounter, Beth sustained a cut to the palm of her hand. She admits, however, she never saw a knife on defendant.
 {¶ 14} Defendant testified on his own behalf. According to defendant, he knew he should not have been at the marital residence, but he "just wanted to know why, why she had ruined my life. And I thought I would have a chance to talk to her. I never went with any violent intentions * * * and if I had seen Beth in the home I never would have even confronted them because I don't want Beth to experience things she's had to go through." (Tr. 481.)
 {¶ 15} Defendant stated that on January 2, 2005, he went to the marital home, saw the lights and T.V. were on, extinguished the electrical source for the home, and saw everything go black. He walked around to the front door, opened the unlocked door, and entered. As he did, "she [Barbara] was coming around the couch towards me entering the foyer, and she's yelling `What are doing here, what are you doing here?'" (Tr. 482.) According to defendant, Barbara ran up to him and shoved him. She closed the door behind him, and she shoved him into the corner of the wall beside the front door opening. Barbara began yelling, "Beth, Beth, you're dad is here to kill us. Call 911, call 911." (Tr. 483.) Barbara then shoved defendant back and started running up the steps. Defendant grabbed her by the arm to stop her from going up, but she pulled away and continued up the stairs.
 {¶ 16} Defendant followed Barbara into Beth's bedroom, and he heard Beth, who had been crying, say, "Daddy, you're not supposed to be here." Id. As he entered the room, he saw Beth kneeling on the floor in front of her bed with the land line phone. He went in, immediately grabbed the phone out of Beth's hand and pulled the cord. As he did so, Beth was yelling, "Daddy, daddy, what are doing here?" and Barbara was saying, "He is going to kill us, he is going to kill us." Id. Denying that he ever tried to strangle his wife, defendant explained that she was kicking him in the back and screaming at him. He turned and shoved her onto the bed, where she tried to scoot back. He put his knee down beside her, grabbed her with one arm, and said "Would you shut up?" (Tr. 485.) He "backslapped her a couple of times pushing her down on the bed trying to keep her from scooting back on the bed. She was kicking at [him]." Id. He then felt Beth poke him in the back with a knife. He got off his knee, and Beth backed up from him. He put his arm around her shoulder and said, "You're going to kill me, your dad? I'm here to talk to you." (Tr. 487.) He took the knife out of her hands as he held her by her shoulders.
 {¶ 17} He turned around and leaned against the dresser. At that point, Beth was standing in the middle of the room crying and screaming. Barbara was scooted back on the bed close to the window. Defendant said, "Look, you stupid bitches, I'm here to talk to you. I'm not going to kill anyone." (Tr. 488.) According to defendant, Beth was screaming "Daddy," and Barbara was "just totally screaming `You crazy mother fucker.'" Id. Defendant had the duct tape and told them, "I have got duct tape here. If you guys don't shut up and quit screaming I'm going to duct tape your mouth shut so I can talk to you." (Tr. 489.) At that point, he heard someone knock on the door downstairs, and the police entered. They apprehended him, and he informed them how to restore electricity to the home.
 {¶ 18} Defendant contends that, because the jury found him not guilty of attempted murder and the state dismissed the felonious assault charges, the jury's verdict finding defendant guilty of kidnapping necessarily was premised on the jury's determining defendant restrained Barbara for the purpose of either terrorizing her or inflicting serious physical harm on her. While defendant admits that Barbara and Beth both testified defendant wielded a knife and threatened to kill them, and that Barbara claimed defendant strangled her, defendant nonetheless contends the physical evidence of the encounter was so limited as to render their testimony unpersuasive, especially in light of the jury finding defendant not guilty of attempted murder.
 {¶ 19} Initially, construing the evidence in favor of the state, we conclude the testimony of Barbara and Beth is sufficient to allow the jury to find defendant purposely terrorized Barbara. Their testimony reflects that defendant purposely shut off the electricity to the marital residence so that he could sneak into the house in the dark. Once there, defendant pushed Barbara into the wall and choked her. On hearing his daughter's voice, defendant ran up the stairs where he grabbed the phone out of her hand and rendered it inoperable. He said on multiple occasions that he would kill them both, threatened to tie them up to keep them from screaming, and brought duct tape with him into the home.
 {¶ 20} Were the testimony of Barbara and Beth Hughes insufficient, defendant's own testimony confirmed that he held Barbara down by force and restrained her of her freedom of movement. He further admitted Barbara was terrorized, though he denied going to the home for the purpose of terrorizing her, and admits his actions produced screaming, yelling, crying, and hysteria from both women. Construing the evidence in favor of the state, the jury could reasonably conclude that defendant restrained Barbara for the purpose of terrorizing her: his actions, taken in a dark home, accompanied by threats of duct taping the women and killing them, allowed the jury to reasonably reach that conclusion.
 {¶ 21} Defendant also contends the judgment is against the manifest weight of the evidence. During cross-examination of Barbara, defendant was able to bring to the jury's attention a number of points that could affect the jury's assessment of Barbara's credibility. For example, defendant questioned her extensively about the underlying divorce and the nature of her efforts to settle the divorce in a fashion that, on its face, would appear inequitable to the jury. Defendant also emphasized that Barbara did not seek medical treatment after the alleged assault or claimed strangulation, did not lose consciousness, and did not have other physical indicia of strangulation. He also forced her to admit she was terminated from her position as a nurse with Grant Hospital for stealing prescription drugs.
 {¶ 22} While the alleged duct tape and strangulation played a significant role in Barbara's testimony, defendant also was able to elicit evidence that her statement to the police following the incident did not mention duct tape, and her subsequent call to the witness advocate did not mention strangulation. Although the points defendant made during Barbara's cross-examination could affect the jury's resolution of the credibility issues in this case, they did not so significantly undermine Barbara's testimony as to render the judgment against the manifest weight of the evidence. Indeed, by his own testimony, defendant admitted to many of the facts that support the jury's determination. In light of the state's evidence and defendant's own testimony, we cannot conclude the jury lost its way in finding defendant guilty of kidnapping with the intent to terrorize. Defendant's first and second assignments of error are overruled.
II. Third Assignment of Error
 {¶ 23} Defendant's third assignment of error contends the trial court erred in sentencing defendant to 13 years and nine months pursuant to the felony sentencing guidelines in effect subsequent to the United States Supreme Court's decision inBlakely v. Washington (2004), 542 U.S. 296. The trial court's sentence was imposed prior to the Ohio Supreme Court's decision in Foster, supra.
 {¶ 24} "In Foster, the Supreme Court of Ohio determined that portions of this state's sentencing statutes violate theSixth Amendment to the United States Constitution in the manner set forth in Apprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348, and Blakely, supra." State v. Draughon, Franklin App. No. 05AP-860, 2006-Ohio-2445, at ¶ 5. As a result ofFoster, the offending provisions of Ohio's sentencing statutes were severed with the result that trial court's now "have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than minimum sentences." Foster, supra, at paragraph seven of the syllabus.
 {¶ 25} Here, the state properly observes that defendant objected to the sentencing, citing Blakely. Accordingly, the state appropriately concedes that defendant is entitled to resentencing pursuant to Foster. Defendant's third assignment of error is sustained.
 {¶ 26} Having overruled defendant's first and second assignments of error, we affirm that portion of the trial court's judgment finding defendant guilty of the noted offenses. Having sustained defendant's third assignment of error, however, we remand for resentencing pursuant to Foster.
 Judgment affirmed in part and reversed in part; remanded forresentencing.
Bryant, Petree and Bowman, JJ., concur.
Bowman, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.