OPINION
{¶ 1} Defendant-appellant, Vernon Spence ("appellant") appeals from a judgment entered upon a jury verdict by the Franklin County Court of Common Pleas, convicting him of six counts of aggravated murder, one count of aggravated burglary, one count of aggravated robbery and three counts of kidnapping, all carrying firearm specifications.
 {¶ 2} The following facts are gleaned from the record. In July 2003, Aaron Grexa ("Grexa"), Eric Hlass ("Hlass") and Brandon Conners ("Conners") lived together in a rented house located at 235 East 11th Avenue in Columbus, Franklin County, near the campus of The Ohio State University. Kayla Hurst ("Hurst") was dating Grexa. Grexa was involved in marijuana trafficking and sold the drug from his campus-area home.
 {¶ 3} In late July 2003, appellant was dating Kristin Woodard ("Woodard"). Woodard's roommate, Amy Reece ("Reece") told appellant about an opportunity to purchase several pounds of marijuana. Appellant expressed interest in the marijuana, so Reece arranged to take appellant to the place of purchase on July 20 or 21, 2003. Appellant and his friend, Kasey Armstrong ("Armstrong") drove in one car and followed another car occupied by Reece and her sister, Melody, to Grexa's home at 235 East 11th Avenue. Reece accompanied appellant and Armstrong into the house.
 {¶ 4} Reece, Armstrong, and appellant went upstairs with Grexa and Hurst. Grexa, Hurst and Reece went into Grexa's bedroom, while appellant and Armstrong waited in the hall. Grexa removed some marijuana from a suitcase, weighed it using a scale, then called appellant and Armstrong into the room. Upon examining the marijuana, appellant and Armstrong declared that they did not want to buy it due to its poor quality. Appellant and his group then left the home.
 {¶ 5} Later, appellant telephoned his friend, Todd Bensonhaver ("Bensonhaver") and told him that he wanted Bensonhaver to participate in a robbery that appellant was planning to conduct on July 22, 2003. Appellant told Bensonhaver that he and Armstrong knew where they could steal 25 pounds of marijuana, along with cocaine and ecstasy. Appellant refused to reveal the location of the planned robbery, and later, Bensonhaver agreed to participate. In turn, Bensonhaver contacted Kareem Rahmaan ("Rahmaan"), who also agreed to participate in the robbery. Appellant, Bensonhaver and Rahmaan had been friends for many years.
 {¶ 6} The three met on July 22, 2003, as planned. They discussed their plan in general terms and appellant revealed the location of the robbery. It was agreed that because appellant had previously been to the home, he would go to the door first in order to gain entry. Later that day, Bensonhaver drove the group to 11th Avenue and parked across the street from the Grexa residence. The three men sat in the car while appellant telephoned Woodard to inquire whether Reece was in Grexa's house. Appellant told Rahmaan that appellant did not want Reece in the house during the robbery. He was unable to determine Reece's whereabouts, however, so the three men left to visit a friend. Eventually, appellant became satisfied that Reece was not in the house, and the men returned, this time parking the car on 10th
Avenue.
 {¶ 7} At 10:55 p.m., using Bensonhaver's cell phone, appellant called Armstrong to tell him that the group was on its way to rob the people at the house where the two had seen the drugs earlier in the week. Appellant was armed with a black, .38-caliber handgun, Rahmaan carried a chrome, .38 caliber handgun, and Bensonhaver was armed with a black, .22 caliber revolver that Rahmaan had obtained for him the day before.
 {¶ 8} At 11:00 p.m., the three men went to the front door and appellant knocked on the door. A man wearing glasses answered the door, and appellant told the man that he wanted to buy some marijuana, and asked if the man remembered him. The man stated that he did remember appellant (thus, the man was probably Grexa), but informed appellant that he was not selling, or did not have any marijuana for sale. At that point, appellant drew his weapon and backed Grexa into the house.
 {¶ 9} Rahmaan and Bensonhaver also entered the house, where they encountered Hlass sleeping on the couch. The robbers awakened Hlass and demanded drugs; Grexa and Hlass were very cooperative. When appellant asked them whether anyone else was in the house, Grexa indicated that his girlfriend was upstairs. The group went upstairs, where they found Hurst exiting the north bedroom at the top of the stairs. With his gun still drawn, appellant backed Hurst into that bedroom.
 {¶ 10} Grexa and Hlass showed Bensonhaver and Rahmaan drugs that were stored in a suitcase in the south bedroom. Bensonhaver held his gun on Grexa and Hlass while Rahmaan retrieved the suitcase. Bensonhaver demanded that Hlass bind Grexa's hands with speaker wire, then demanded money, whereupon Hlass took Bensonhaver back downstairs. Hlass turned over approximately $70-$80 that had been stored in a black trunk by the front door. Bensonhaver then took Hlass back upstairs and into the south bedroom, and tied his hands with speaker wire.
 {¶ 11} Rahmaan took the suitcase with him while he searched the first floor for more money and drugs, while Bensonhaver remained in the south bedroom with Grexa and Hlass. Bensonhaver called out for appellant, whereupon appellant brought Hurst into the south bedroom. As appellant and Hurst were going toward the south bedroom, Rahmaan was coming upstairs. He saw that Hurst was holding her stomach and crying. Appellant told Rahmaan to tie Hurst, and Rahmaan complied, again using speaker wire. Each victim was bound with his or her hands behind their backs, and their ankles were bound as well.
 {¶ 12} While Rahmaan was tying Hurst's wrists and ankles, appellant and Bensonhaver were in the hallway. According to Bensonhaver, appellant pulled latex gloves from his pocket and told Bensonhaver that he had to "do it." (Tr., 175, 233.) He explained to Bensonhaver that, "they know me" and "they have to go." (Tr., 175, 233.) As Rahmaan approached Bensonhaver and appellant in the hallway, Rahmaan thought that the other two were having an argument. He told them that the drugs were downstairs and that they should all leave. Appellant told the other two to go, then proceeded toward the south bedroom.
 {¶ 13} Rahmaan and Bensonhaver ran downstairs, grabbed the suitcase containing the drugs, and exited the house through the back door. As they left the house, they heard a gunshot, followed by a second shot. By this time, the two were sprinting down the alley. Ray Lyons ("Lyons"), who lived near 235 East 11th Avenue, testified that at approximately 11:30 or 11:45 p.m. on July 22, 2003, he heard four to six gunshots. After the first two shots were fired, Lyons saw a black man running down the alley behind East 11th Avenue, with a second black man running seconds behind the first. Lyons immediately called 9-1-1 to report the gunshots and the direction that the men were running. For reasons not disclosed in the record, however, authorities did not immediately respond to the scene. At approximately noon on July 23, 2003, Conners, who had spent the night at a friend's house, returned home, discovered the bodies of Hurst, Hlass and Grexa, and immediately called police, who responded moments later.
 {¶ 14} In the meantime, when they reached Bensonhaver's car, Rahmaan and Bensonhaver put the suitcase in the trunk, then drove around the block and picked appellant up near the alley. Bensonhaver testified that appellant had blood on his face. Rahmaan drove to his home, where the three took the marijuana and money out of the suitcase. Rahmaan gave appellant a clean shirt because appellant had used his shirt to wipe the blood off of his face. Rahmaan testified that they spent no more than 15 or 20 minutes at his home.
 {¶ 15} While at Rahmaan's home, appellant used Bensonhaver's cell phone to call Armstrong to request a meeting at Mr. Magoo's, a nearby bar. The three left for Mr. Magoo's, with Rahmaan driving his own car, and Bensonhaver and appellant in Bensonhaver's car. On the way, they threw the suitcase in a trash bin near Rahmaan's home, then dropped Bensonhaver's car off at his home, then stopped for five or ten minutes at the home of a man named "Shaw" to pick up some cocaine.
 {¶ 16} Armstrong testified that when he arrived at Mr. Magoo's, he noticed that appellant, Rahmaan and Bensonhaver all looked "discombobulated." He testified that Bensonhaver looked "a little edgy" and that Rahmaan appeared "like he was having a nervous breakdown." Appellant, he said, looked "[l]ike he normally looked, just with a stern face. Just sitting there." (Tr., 457.) According to Rahmaan, as the four men sat drinking together, appellant told Armstrong that he, Bensonhaver and Rahmaan had just "hit" the robbery that appellant and Armstrong had discussed earlier. Then, Bensonhaver blurted out to Armstrong that appellant had just killed three people. According to Armstrong, though appellant was seated with the others and heard Bensonhaver's statement, appellant showed no reaction to it.
 {¶ 17} Armstrong told them that they had just "fucked up" his life by telling him about the murders; then he left Mr. Magoo's. Appellant, Rahmaan and Bensonhaver left Mr. Magoo's and stopped for 10 to 15 minutes at the home of Thomas Hess to buy more drugs, and then they went to another home and smoked marijuana, after which appellant and Bensonhaver played video games until the next morning, while Rahmaan slept on a couch. The next day, Armstrong again met appellant, Bensonhaver and Rahmaan, this time in a parking lot behind an apartment complex. The three tried to sell marijuana to Armstrong, but he refused to buy it because, he said, he knew it was the marijuana taken from the East 11th Avenue apartment where the murders had occurred.
 {¶ 18} During a conversation that took place about one week after the murders, appellant told Rahmaan that Rahmaan and Bensonhaver did not know that appellant was planning to murder the robbery victims, that he would take responsibility for the murders and that they would not have to "go down" for something that he did.
 {¶ 19} In late July or early August 2003, appellant tried to sell his portion of the marijuana to Troy Radcliff ("Radcliff"). Appellant told Radcliff that he had obtained the marijuana during a robbery he committed with Bensonhaver and Rahmaan. He also told Radcliff that he shot three people on 11th Avenue, and that he had shot them again when they did not stop moving. When the two saw Hurst's father on television pleading for assistance in solving the case, appellant told Radcliff that he would not be caught. Radcliff went to the authorities with this information in December 2003.
 {¶ 20} Eventually, appellant sold his portion of the marijuana to Carey Runyan ("Runyan"). Runyan knew that the marijuana had come from the East 11th robbery, and asked appellant what happened that night. Appellant responded that "they knew my face" and that he "had to get rid of them." (Tr., 520.)
 {¶ 21} Meanwhile, Bensonhaver continued to sell drugs. In the course of a transaction with a confidential informant, which was being recorded, he told the informant that he had been involved in the East 11th robbery and that appellant had killed three people. Rahmaan, too, sold drugs after the robbery. On September 16, 2004, he and Bensonhaver were arrested on federal and state charges. Initially, Bensonhaver refused to cooperate, but later agreed to plea agreements in which he pled guilty in state court to three counts of involuntary manslaughter, one count of aggravated burglary, one count of aggravated robbery and three counts of kidnapping, all with firearm specifications, and pled guilty in federal court to possession and distribution of in excess of 50 grams of cocaine base (commonly referred to as "crack"). He also agreed to tell authorities the truth about the East 11th Avenue robbery and to testify on behalf of the State. In return, he received concurrent sentences for the state and federal charges, with an aggregate term of incarceration of 21 years.
 {¶ 22} When questioned by police about the robbery, Rahmaan consistently stated that appellant had committed all three murders. He called his girlfriend and directed her to hand over his gun to police. He also called appellant and unsuccessfully attempted to induce appellant to confess to the murders on tape. Later, Rahmaan, too, entered into plea agreements in which he agreed to plead guilty in state court to three counts of involuntary manslaughter, one count of aggravated burglary, one count of aggravated robbery and three counts of kidnapping, all with firearm specifications, and to plead guilty in federal court to possession and distribution of in excess of 50 grams of cocaine base. He agreed to cooperate with authorities and testify on behalf of the State. In exchange, he also received a 21-year aggregate state prison sentence, which was to be served concurrently with his federal sentence.
 {¶ 23} Following Bensonhaver's and Rahmaan's arrest, appellant called Armstrong and complained that Rahmaan had called him and had talked about "the stuff that happened" on 11th Avenue. Later, Armstrong and his attorney approached the investigating detective and told her what Armstrong knew about the case.
 {¶ 24} On September 27, 2004, the Franklin County Grand Jury indicted appellant on six counts of aggravated murder with death penalty specifications, one count of aggravated burglary, one count of aggravated robbery and three counts of kidnapping. All counts included firearm specifications. Appellant was later arrested and pled not guilty to all charges. His trial began on July 11, 2005. In addition to the testimony detailed hereinbefore, the jury also heard from police and investigators, a deputy coroner, Reece, Rahmaan's girlfriend, Erica Scott, and Troy Patterson, who spent time in jail with appellant in September 2004.
 {¶ 25} Patterson testified that appellant told him that he had gone to the Grexa residence to buy marijuana and returned three days later. According to Patterson, appellant then confessed to him that appellant had planned and participated in the robbery, kidnapping and murders of Hurst, Hlass and Grexa, and that he had burned the clothing he was wearing that night and had disposed of the murder weapon in Nelson Creek.
 {¶ 26} The jury found appellant guilty of all charges, whereupon a separate penalty phase was held, after which the jury recommended a sentence of life in prison without parole. In accordance with the jury's recommendation, the court imposed three consecutive life terms of imprisonment without parole for the aggravated murder counts. The court also sentenced appellant to ten years for each of the remaining counts, all to be served consecutively to each other and to the life terms, plus one three-year term representing all of the firearm specifications, which the court merged into one.
 {¶ 27} Appellant timely appealed and advances the following seven assignments of error for our review:
 Assignment of Error I
 Appellant's convictions were not supported by sufficient evidence and were against he manifest weight of the evidence.
 Assignment of Error II
 The trial court commits reversible error by excluding defense testimony showing a state's witness is a snitch or that his reputation is that of a snitch, thereby denying Appellant his right to a fair trial under the state and federal constitutions.
 Assignment of Error III
 The trial court commits reversible error when it permits the state to exhibit photographic evidence to the jury, where the prejudicial value of the evidence is not outweighed by its probative value, thereby denying Appellant's right to a fair trial under the state and federal constitutions.
 Assignment of Error IV
 Appellant was denied effective assistance of counsel, in violation of Appellant's 6th and 14th
Amendment rights under the federal constitution and Article I, Section 10 of the Ohio Constitution.
 Assignment of Error V
 It was plain error for the trial court to: allow the hearsay testimony of Kasey Armstrong; fail to give the lesser included murder instruction before the jury retired to deliberate; fail to read the instruction on each separate count of aggravated murder for each victim; fail to read the instructions for each count of kidnapping; fail to read all of the verdict forms for each count of aggravated murder; fail to read any of the verdict forms for the charges of aggravated robbery, aggravated burglary and kidnapping; and fail to give the proper "other acts" instruction.
 Assignment of Error VI
 The trial court commits reversible error for giving maximum consecutive sentences when there were no facts proven beyond a reasonable doubt to the jury to support giving non-minimum, maximum consecutive sentences.
 Assignment of Error VII
 The trial court commits reversible error when it fails to merge three kidnapping counts into the aggravated robbery count of conviction.
 Weight and Sufficiency {¶ 28} In support of his first assignment of error, appellant argues that the evidence adduced at trial is insufficient to support his convictions, and that his convictions were against the manifest weight of the evidence.
 {¶ 29} The Supreme Court of Ohio outlined the role of an appellate court presented with a sufficiency of evidence argument in State v.Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319,99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 30} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175,20 OBR 215, 485 N.E.2d 717. Rather, the sufficiency of evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."Jackson, supra, at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 80, 24 O.O.3d 150,434 N.E.2d 1356. The reviewing court does not substitute its judgment for that of the factfinder. Jenks, supra, at 279.
 {¶ 31} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 32} The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967), 10 Ohio St.2d 230,39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins, supra, at 387.
 {¶ 33} Appellant's sole argument in support of his evidentiary sufficiency challenge consists in his contention that the testimony of the State's witnesses who implicated him in the murders, or who testified that appellant made inculpatory statements, was so completely unreliable that his convictions are unsupported by sufficient evidence. Appellant does not argue that any particular element of any of his convictions was unsupported by sufficient evidence; he focuses solely on the unreliability of the State's evidence in toto.
 {¶ 34} He argues that both Bensonhaver and Rahmaan were strongly motivated to lie because they were facing federal drug charges as well as state charges arising from the murders, and both had criminal records. He argues that the authorities' evidence gathering and pursuit of drug charges against the two men resulted in their testimony being tainted by coercion. Appellant also argues that the other witnesses who implicated him were "all convicted felons and given substantial reductions in pending charges or granted immunity for past drug dealing crimes, to testify against appellant."[1]
 {¶ 35} The testimony of these witnesses as to appellant's involvement in the murders, he argues, was so inherently unreliable that it was insufficient to prove his guilty beyond a reasonable doubt. "This contention, however, calls for an evaluation of [the witnesses'] credibility, which is not proper on review of evidentiary sufficiency."State v. Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 200, citing State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126,767 N.E.2d 216, ¶ 79.
 {¶ 36} Appellant was convicted of three counts of aggravated murder, in violation of R.C. 2903.01(A), which provides, "No person shall purposely, and with prior calculation and design, cause the death of another * * *." "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).
 {¶ 37} "Prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes."State v. Coley (2001), 93 Ohio St.3d 253, 264, 754 N.E.2d 1129. InState v. Carson, 10th Dist. No. 05AP-13, 2006-Ohio-2440, we recently explained:
 Prior calculation and design requires something more than instantaneous deliberation. Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.
Id. at ¶ 24. (Citations omitted.)
 {¶ 38} Appellant was also convicted of three counts of kidnapping in violation of R.C. 2905.01(A)(2), which provides, "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * To facilitate the commission of any felony or flight thereafter[.]"
 {¶ 39} Appellant was also convicted of one count of aggravated burglary in violation of R.C. 2911.11(A), which provides:
 No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
 {¶ 40} Appellant was also convicted of aggravated robbery in violation of R.C. 2911.01(A), which provides:
 No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
 (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
 (3) Inflict, or attempt to inflict, serious physical harm on another.
 {¶ 41} Having reviewed the elements of each and every offense of which appellant was convicted, as well as all of the evidence adduced at trial, we conclude that appellant's convictions are supported by sufficient evidence. Bensonhaver's and Rahmaan's eyewitness testimony, along with appellant's confessions to others, constitutes sufficient evidence of every element of each of appellant's offenses of conviction.
 {¶ 42} In support of his manifest weight argument, appellant again contends that the state's witnesses were not credible. He argues that several of the witnesses are not credible because certain details of their testimony conflict with other evidence. Appellant argues that Bensonhaver is not credible because he testified that he was sure that he, Rahmaan and appellant arrived at Mr. Magoo's by midnight on July 23, 2003, whereas the coroner opined that the time of death for all three victims was 12:12 a.m. on July 23, 2003.
 {¶ 43} But this testimony is not necessarily inconsistent; the jury could have believed that appellant shot the victims before midnight and arrived at Mr. Magoo's by midnight, and that the victims did not expire until 12:12 a.m. Moreover, Dr. Belding, the deputy county coroner who performed autopsies of the victims' bodies, testified that the 12:12 a.m. time of death was taken from a report made by someone at the scene and was merely an estimate. Dr. Belding further testified that he did not have sufficient information to opine, within a reasonable degree of medical certainty, as to the victims' time of death. In any case, it is well-settled that the jury is responsible for resolving inconsistencies and drawing reasonable inferences from facts that it determines to be true. Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781,61 L.Ed.2d 560.
 {¶ 44} Appellant also argues that Bensonhaver's testimony that appellant donned latex gloves before shooting the victims is unreliable given that Rahmaan never testified to having seen appellant wearing latex gloves. But nowhere in the transcript of his testimony did Rahmaan ever contradict Bensonhaver in this regard, nor was Rahmaan ever asked about whether he saw appellant wear latex gloves. That Rahmaan's testimony did not contain precisely the same content as Bensonhaver's does not render Bensonhaver's testimony unworthy of belief or entitled to no weight by the trier of fact.
 {¶ 45} In a similar vein, appellant argues that Bensonhaver's testimony that appellant was covered in blood following the shootings demonstrates his unreliability because Rahmaan's live-in girlfriend, Erica Scott ("Scott"), never mentioned appellant being covered in blood despite the fact that, according to her testimony, she saw appellant when the three men initially entered Rahmaan's house. But Scott testified that she saw appellant, Rahmaan and Bensonhaver through the peephole of the front door, that Rahmaan and Bensonhaver entered the house before appellant, and that when she opened the door, Rahmaan told her to go upstairs. In light of this testimony, the jury was free to conclude that Scott had related all of the details of appellant's appearance that she could, but that she simply did not see the blood on appellant's face or shirt.
 {¶ 46} Moreover, Scott was never asked about whether she saw any blood; appellant merely surmises "if [Scott] had seen such startling evidence, the state certainly would have asked her about it."[2] We will not engage in such speculation; our task is to review the record before us, not to assume reasons why it does not contain certain testimony. Appellant's argument is premised upon the simple notion that Scott is more credible than Bensonhaver. While our review of the manifest weight of the evidence requires us to weigh the evidence, having done so we see no reason to invade the province of the jury in evaluating the credibility of the witnesses here. In conducting our review we are mindful of the trier of fact's superior, first-hand position in judging the demeanor and credibility of the witnesses. SeeState v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366,227 N.E.2d 212, paragraph one of the syllabus. A conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. State v. Kendall, (June 29, 2001), 10th Dist. No. 00AP-1098.
 {¶ 47} Appellant further argues that Bensonhaver is unreliable because, despite the fact that Bensonhaver related his involvement in the murders to the confidential informant to whom he sold drugs, the audiotape of their conversation does not contain Bensonhaver saying appellant's name. Our review of the tape reveals that Bensonhaver said appellant's name twice during the taped conversation, once referring to him as "Vernon" and once referring to him as "Vito", which Bensonhaver testified was a nickname of appellant's. Moreover, Bensonhaver testified that he did tell the confidential informant that appellant killed the victims. (Tr., 206.)
 {¶ 48} Appellant argues that Rahmaan's testimony was not credible because he admitted, during cross-examination, that when he agreed to cooperate with authorities during a police interview, he told a detective, "I will make you as happy as you need to be." (Tr., at 373.) Appellant contends that this statement "leaves no doubt that Rahmann (sic) agreed to say whatever the police wanted, in order to avoid the death penalty or life in prison, regardless of the truth of those statements." (Brief of Appellant, at 19.) From its superior vantage point, however, the jury was able to observe Rahmaan's demeanor during his testimony, and to judge his credibility in light of the statement he made to the detective.
 {¶ 49} Appellant argues that Armstrong's testimony is unworthy of belief because he twice denied knowledge of the shootings, but only came forward with information after the police executed a warrant to search the home that he shared with appellant. The search, appellant contends, amounted to police coercion, rendering Armstrong's testimony unreliable. These facts, however, were fully explored on cross examination, during which Armstrong explained that he decided to come forward after speaking with his attorney, who advised him that remaining silent could place him in serious trouble. The jury heard all of Armstrong's testimony and was best able to evaluate which portions, if any, to believe, including his explanation for having waited to come forward with information implicating appellant in the shootings.
 {¶ 50} Similarly, appellant argues that Radcliff's testimony that appellant confessed to him is unbelievable because he claimed he came forward out of a sense of a moral obligation to do so, yet he had socialized with appellant nearly every day until appellant's arrest. The jury was in the superior position to observe Radcliff's demeanor and to assess whether Radcliff was telling the truth about having had no compunction about socializing with appellant following appellant's confession, but later having felt motivated by a moral duty to assist authorities.
 {¶ 51} Appellant claims that Patterson's testimony was wholly unreliable for three reasons. First, appellant points out that Patterson was in lock-up with appellant for several days before he gave authorities a statement. But the jury could evaluate this delay in the same manner that it could evaluate Radcliff's and Armstrong's delays in coming forward. Appellant also argues that Patterson could not be believed because he had a reputation as a jailhouse snitch. But this evidence was never introduced except through an allusion to it by defense counsel during Patterson's cross examination. Finally, appellant argues that Patterson's testimony is not believable because he claimed that appellant told him that he threw the murder weapon into Nelson Creek, yet there was no evidence that a gun was ever recovered from Nelson Creek. Appellant urges that "[i]t can be safely assumed that Nelson Creek was thoroughly searched by police." We cannot indulge in assumptions; we deal only with the record before us. The jury is capable of resolving inconsistencies in the evidence such as this; therefore, it is not a reason to reverse a conviction as being against the manifest weight of the evidence.
 {¶ 52} Because we find that appellant's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence, we overrule his first assignment of error.
 Reputation Evidence {¶ 53} In support of his second assignment of error, appellant argues that the trial court erred when it refused to allow him to present the testimony of David Braine ("Braine"). Review of appellant's proffer reveals that Braine had been in jail with Patterson and would have testified that he was familiar with Patterson's reputation among inmates as a "snitch." Appellant argues that he should have been allowed to present Braine's testimony because it, together with the fact that Patterson was a party to a plea agreement on a drug case, would have been probative of the issue whether Patterson was truthful or untruthful when he testified against appellant. He argues that he has a right to try to demonstrate that a state's witness has a motive to lie and that Braine's testimony would have been part of an attempt to prove that Patterson was lying by showing that he has a reputation for "snitching."
 {¶ 54} Appellant argues that Patterson's history of snitching is essential to his claim that Patterson lied. He contends that Patterson's reputation as a snitch demonstrates his penchant for lying because "[s]nitches, by reputation, are not trustworthy people[,]" and "[t]he dubious nature of information given by a snitch is a common understanding[.]"[3] Appellant also argues that Braine's testimony was offered to impeach Patterson's denial, during cross-examination, that he has a reputation as a snitch.
 {¶ 55} Appellant contends that he was entitled to present Braine's testimony pursuant to Evid.R. 404(B), 405, 608 and 616. Evid.R. 404(B) provides that evidence of other acts may be admissible for proof of bias or motive. Evid.R. 405 allows a party to prove character or a trait of a person through testimony as to reputation, and allows proof by specific instances of conduct when the character or trait is essential to a claim such as, in this case, a claim that a witness is biased or has a motive to lie. Evid.R. 608(A) governs evidence of the reputation of a witness for a particular character, such as truthfulness. Evid.R. 616 allows a witness to be impeached for bias or motive to misrepresent using extrinsic evidence.
 {¶ 56} In response, the State argues that appellant's proffered reputation evidence was inadmissible because Patterson's reputation as a snitch, if any, would not establish that Patterson had a motive to lie in appellant's case, or that Patterson was biased againstappellant. The record discloses that Patterson did not know appellant prior to being incarcerated with him and Patterson received no benefits for testifying in appellant's case.[4] On these facts, the State argues, Patterson's general reputation for providing assistance to the government would not have demonstrated that Patterson had a motive to lie during his testimony against appellant, or that Patterson had a particular bias against appellant.
 {¶ 57} We note initially that the admission or exclusion of relevant evidence is a matter within the sound discretion of the trial court.State v. Ketterer, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 126. The judgment of the trial court in this regard will not be reversed absent an abuse of that discretion and clear prejudice to the defendant resulting therefrom. State v. Hymore (1967), 9 Ohio St.2d 122, 128,38 O.O.2d 298, 224 N.E.2d 126.
 {¶ 58} Evid.R. 608(A) provides, "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, * * * [as] to character for truthfulness or untruthfulness[.]" In order for this court to find that Braine's testimony was admissible pursuant to Evid.R. 608(A), we would be required to accept the notion that cooperation with authorities in the criminal prosecution of fellow inmates equates to being untruthful. We do not accept this proposition, and appellant has provided no authority to persuade us to conclude otherwise.
 {¶ 59} Evid.R. 404(B) likewise does not permit the admission of Braine's testimony that Patterson was a reputed snitch. That rule allows evidence of other "acts" to be admitted to prove, as relevant here, motive. First, evidence that Patterson has a reputation as a snitch does not prove that he committed any specific "acts" of snitching, though it may support the inference that he has cooperated with authorities. More importantly, however, even if Patterson's reputation as a jailhouse snitch proves that he has provided information to authorities in other cases, it does not equate to proof of a motive for Patterson to lie
during his testimony against appellant. Again, such a connection requires the acceptance of the underlying premise that cooperating with authorities in criminal prosecutions in order to garner favorable treatment for oneself equates to being untruthful, and we do not accept that premise. Finally, other "acts" of testifying against fellow inmates do not demonstrate that Patterson had a motive to lie in appellant's case, or that he had a particular bias against appellant.
 {¶ 60} Evid.R. 405, which allows reputation testimony to be used as evidence of character or a trait of character of a person, also does not support appellant's argument because the most that Braine's testimony provesis that Patterson is a cooperator with the government; it does not prove that Patterson is a liar.
 {¶ 61} It is true, as appellant points out, that Evid.R. 616(A) allows a party to impeach a witness using extrinsic evidence to demonstrate bias or motive to misrepresent, but as discussed above with respect to Evid.R. 405, extrinsic evidence of Patterson's reputation for cooperating with authorities in other cases in exchange for favorable treatment does not, alone, demonstrate any bias against appellant or motive to misrepresent the facts in the present case. There was no proffer that Braine would have testified that Patterson had lied or otherwise had been less than completely truthful in any testimony he gave in other cases.
 {¶ 62} Evid.R. 616(C) allows impeachment by extrinsic evidence that contradicts a witness' testimony, but only if such extrinsic evidence is permitted by Evid.R. 608(A), 609, 613, 616(A) or (B), or 706, or by the common law of impeachment not in conflict with the Rules of Evidence. Evid.R. 616(C)(1) and (2). Braine's proffered testimony would have contradicted Patterson's denial, during cross-examination, that he had a reputation as a snitch, but Braine's statements are not admissible under any of the rules enumerated in Evid.R. 616(C)(1) and (2); therefore, Evid.R. 616 does not support appellant's argument that the trial court erred in refusing to allow Braine to testify.
 {¶ 63} Because Braine's proffered testimony was inadmissible we conclude that the trial court did not abuse its discretion in refusing to admit it, and we overrule appellant's second assignment of error.
 Photographic Evidence {¶ 64} In support of his third assignment of error, appellant argues that the trial court erred in admitting State's Exhibits 1-B138 and 1-B139. These exhibits are photographs taken on the day that the bodies of Hlass, Hurst and Grexa were discovered. They depict a portion of the floor of the south bedroom, directly underneath the victims' bodies, as that area appeared immediately after the bodies were removed. Exhibit 1-B138 was taken at a greater distance from the floor, while Exhibit 1-B139 is a close-up of part of the same area of the floor depicted in State's Exhibit 1-B138.
 {¶ 65} Both exhibits depict a patterned rug covering the wood floor; the rug has been stained with blood. Both exhibits depict a pair of red panties that are rolled up as if they had been deposited on the floor after having been worn. The upward-facing surfaces of the panties appear to be stained with blood. The panties are located a few inches away from a dark pool of blood on the rug.
 {¶ 66} While acknowledging that crime scene photos depicting blood left at the scene are relevant and otherwise unobjectionable, appellant argues that, because they include depictions of the red panties, State's Exhibits 1-B138 and 1-B139 should not have been admitted because their probative value was outweighed by the danger that their admission would unfairly prejudice appellant or would mislead the jury. He points out that on several occasions at trial prosecution witnesses expressed concern over whether Hurst was sexually assaulted. Since the jury heard each and every one of those references, and because the red panties "ostensibly" belonged to Hurst, appellant argues, the photographs unfairly imply that appellant sexually assaulted Hurst, thereby creating a risk of unfair prejudice that outweighs the probative value of the photographs. He also argues that the photographs confused the issues for the jury, given that appellant had not been charged with a sexual assault.
 {¶ 67} Rule 403(A) of the Ohio Rules of Evidence provides, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Decisions on the admissibility of photographs rest within the sound discretion of the trial court. State v. Craig, 110 Ohio St.3d 306, 2006-Ohio-4571,853 N.E.2d 621, ¶ 90.
 {¶ 68} "The issue of whether testimony is relevant or irrelevant, confusing or misleading, is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury." Columbus v. Taylor (1988), 39 Ohio St.3d 162, 164,529 N.E.2d 1382, rehearing denied, 40 Ohio St.3d 707, 534 N.E.2d 850. Thus, "[w]e will not interfere with the trial court's balancing of probativeness and prejudice 'unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby * * *.'" State v. Slagle (1992),65 Ohio St. 3d 597, 602, 605 N.E.2d 916, quoting State v. Hymore (1967),9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126.
 {¶ 69} We have thoroughly examined the record for implications that Hurst had been sexually assaulted. Both Rahmaan and Bensonhaver recalled that, after they had tied up Hlass and Grexa, Hurst and appellant emerged from the bedroom in which Hurst had been sleeping prior to the trio's arrival. Bensonhaver recalled that Hurst was crying and holding her stomach. Rahmaan recalled that Hurst was "emotional" but was not "running and screaming and stuff like that." (Tr., 313.) But the fact that Hurst was emotional and was holding her stomach does not lead to the conclusion that she had been raped. It is, however, a reasonable indication that she was terrified at being held against her will by three armed men who wanted drugs and money.
 {¶ 70} Appellant also directs our attention to Bensonhaver's testimony, in which he recalls that when police initially questioned him, they played for him a tape recording of a conversation between Bensonhaver and the confidential informant to whom Bensonhaver had sold drugs. Bensonhaver admitted that the tape reveals he told the confidential informant about the robbery and the murders, and he told him that he thought appellant had raped Hurst.
 {¶ 71} Finally, appellant points to part of the record in whichdefense counsel inquired whether Rahmaan recalled an interview during which Columbus Police Detective McCoskey told Rahmaan that he and Bensonhaver:
 "* * * had no intention of going in that house and killing anybody, just going in to be an easy lick, get the money, get the weed and get out of there. But one guy can't. He got to take down the girl in the other room while the two guys had nothing to do with that. In fact, didn't want anything to do with that and the guys say they got to go, man. And so the two guys take off out of the house and are seen by witnesses. And after that, things go terribly wrong."
(Tr., 406-407.)
 {¶ 72} There was no transcript of the detective's statement paraphrased by defense counsel, and counsel never asked Rahmaan to clarify what he thought "take down the girl" meant, nor did Rahmaan ever clarify what he thought the statement meant. The statement is not Rahmaan's, nor did Rahmaan expressly adopt it. Moreover, the detective's statement does not constitute evidence that appellant sexually assaulted Hurst, or that Rahmaan believed that he had.
 {¶ 73} The State directs our attention to Bensonhaver's testimony that, while he and appellant were at Mr. Magoo's on the night of the murders, Bensonhaver asked appellant whether he raped Hurst, and appellant swore "on his kids' life" that he did not rape her. (Tr., 188.) There was no objection to this testimony. We also note that the jury was given State's Exhibit 5-E, the Franklin County Coroner's Report and Findings of Fact and Verdict prepared following an autopsy of Hurst's body. The report specifically notes that a rape examination was performed and the external genitalia were examined and found to be atraumatic. (State's Exhibit 5-E, at 4.) Under the section of the report entitled "Evidence of Injury" the report lists two gunshot wounds, two superficial skin abrasions to the face and bruises around the eyes, but makes no mention of any sexual assault-related injury.
 {¶ 74} We note, as the trial court did, that the bedroom in which the bodies were found (as well as the other rooms pictured in the State's exhibits) contained many clothing items strewn on the floor, beds, and other furniture items, and in laundry baskets. This renders unpersuasive appellant's argument that the panties must have belonged to Hurst or that their presence near the bodies would have led the jury to believe that a rape had occurred.
 {¶ 75} Moreover, the balance of the record does not contain implications that appellant sexually assaulted Hurst such that the photographs of the panties, taken together with the rest of the record, would unfairly prejudice appellant or confuse the jury. Other than Bensonhaver's unsubstantiated beliefexpressed to the confidential informant, the only affirmative references to rape are appellant's firmdenial of having raped Hurst, and the autopsy report indicating that Hurst was not raped. The record indicates that Hurst was crying and holding her stomach as she walked down the hall toward the south bedroom, but this does not imply that she had been sexually assaulted; moreover, panties found in the south bedroom, even if it had been proven that they belonged to Hurst, would not help to establish that Hurst had been raped while in the other bedroom.
 {¶ 76} State's Exhibits 1-B138 and 1-B139 were relevant because they showed the amount of blood that remained on the rug after removal of the victims' bodies. This connects appellant to the murders in light of the testimony that he emerged from the house with enough blood on his face that, after using his shirt to wipe his face, he needed to change into one of Rahmaan's shirts before going to Mr. Magoo's.
 {¶ 77} Upon a thorough review of the record we find no abuse of discretion in the trial court's admission of State's Exhibits 1-B138 and 1-B139. Accordingly, we overrule appellant's third assignment of error.
 Hearsay, Other Acts Evidence Jury Instructions {¶ 78} Appellant's fourth and fifth assignments of error present interrelated issues and will be addressed together. In support of his fourth and fifth assignments of error, respectively, he argues that he received ineffective assistance of counsel when counsel failed to object, and that the trial court committed plain error, when the following claimed errors occurred: (1) Armstrong gave hearsay testimony; (2) the trial court gave the wrong "other acts" instruction; (3) the trial court failed to read the instructions related to aggravated murder three separate times, corresponding to each victim; (4) the trial court failed to read to the jury the instructions for each separate count of kidnapping, corresponding to each victim; (5) the trial court failed to read to the jury all of the verdict forms corresponding to each count of aggravated murder; (6) the trial court failed to read to the jury any of the verdict forms corresponding to the counts of aggravated robbery, aggravated burglary and kidnapping; and (7) the trial court failed to charge the jury on the lesser included offense of murder before the jury retired to deliberate.
 {¶ 79} To prove ineffective assistance of counsel, defendant must show that counsel's performance was deficient. Strickland v. Washington
(1984), 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by theSixth Amendment to the United States Constitution. Ibid. The defendant must then show that counsel's deficient performance prejudiced his defense. Ibid. This requires demonstrating that, but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694.
 {¶ 80} "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. A properly licensed attorney is presumed competent, and the burden of proving ineffectiveness is on the defendant. State v. Smith (1985), 17 Ohio St.3d 98, 100, 17 OBR 219,477 N.E.2d 1128. Counsel's actions that "might be considered sound trial strategy" are presumed effective. Strickland, supra, at 689. "Prejudice" exists only when counsel's performance renders the result of the trial unreliable or the proceeding unfair. Ibid. The accused must demonstrate a reasonable probability that a different verdict would have been returned but for counsel's deficiencies. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ibid.
 {¶ 81} An error is plain error only if it is obvious, State v.Barnes (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and, "but for the error, the outcome of the trial clearly would have been otherwise."State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.
 {¶ 82} Appellant argues that the trial court committed plain error in allowing Armstrong to testify that Bensonhaver told him at Mr. Magoo's that appellant had shot the victims; he also argues that he received ineffective assistance of counsel when his attorneys failed to object to this testimony.
 {¶ 83} In response, the State argues that Bensonhaver's statement is not hearsay pursuant to Evid.R. 801(D)(1)(b), which provides, " [a] statement is not hearsay if * * * [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." We agree. This rule permits "rehabilitation of a witness whose credibility has been attacked by means of a charge that he recently fabricated his story or falsified his testimony in response to improper motive or influence, by admitting into evidence a consistent statement made by the witness prior to the time of the suggested invention or of the emergence of the motive or influence to invent or falsify, as tending to rebut the charge." Motorists Mut.Ins. Co. v. Vance (1985), 21 Ohio App.3d 205, 207, 21 OBR 219,486 N.E.2d 1206.
 {¶ 84} In the present case, the nearly singular focus of appellant's cross examination of Bensonhaver was Bensonhaver's alleged motive to fabricate his implication of appellant to save himself from prosecution for the aggravated murders of Grexa, Hlass and Hurst. Defense questioning of Bensonhaver clearly reveals a strategy to charge that police confronted Bensonhaver with an "it's either him or you" scenario in which Bensonhaver could either implicate appellant or face the death penalty himself. Later, when Armstrong testified, the state was entitled to solicit Armstrong's testimony that, within hours following the murders, Bensonhaver made a statement that is consistent with the testimony he gave at trial. Evid.R. 801(D)(1)(b) allows such rehabilitation. As such, counsel was not deficient in failing to object to Armstrong's testimony, and the trial court committed no error in allowing it.
 {¶ 85} Appellant argues that the trial court erred to his prejudice in giving the jury an incorrect and ambiguous instruction on the use of "other acts" evidence, and that counsel was ineffective for failing to object. The court read from the standard other acts instruction found at OJI § 402.61, which states:
 Evidence was received about the commission of (crime[s]) (wrong[s]) (act[s]) other than the offense(s) with which the defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in (conformity) (accordance) with that character. If you find that the evidence of other (crime[s]) (wrong[s]) (act[s]) is true and that the defendant committed (it) (them), you may consider that evidence only for the purpose of deciding whether it proves
 * * *
 (e) (describe other purposes).
 {¶ 86} The court's description of the "other purposes" under paragraph (e) was as follows: "that which was sought to be proved under those circumstances." Appellant argues that this phrase is so ambiguous as to be meaningless, thereby allowing the jury to consider appellant's "other acts" (which the parties agree are his prior drug-related activities) for any purpose that it saw fit. He maintains that this caused him material prejudice because it cannot be assumed that the jury did not consider his other acts as tending to prove his propensity to commit the acts giving rise to the charges against him.
 {¶ 87} In response, the State argues that the jury instructions clearly indicated that the jury was permitted to consider evidence of appellant's drug use and trafficking only to prove the issue for which this other acts evidence was admitted. The evidence relating to appellant's drug use demonstrated that he was present at the 11th Avenue house several days before the murders and it demonstrated why he was present at the house on the night of the murders; it also demonstrated that appellant was acquainted with many of the witnesses through his involvement in drugs. According to the State, it was clear to the jury that there was no other purpose for the other acts evidence.
 {¶ 88} "Trial courts are not required * * * to characterize evidence or to instruct juries as to the category into which certain evidence fits." State v. Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 64. To require the court to enumerate the other acts and identify the evidence of those acts would "require that the trial court usurp the jury's function as the finder of fact." Ibid. Moreover, "[a]ny ambiguity in a selected portion of the instructions does not constitute reversible error unless the instructions, as a whole are so misleading as to prejudicially affect a substantial right of the complaining party."State v. Chapman (Feb. 2, 2002), 8th Dist. No. 79607, 2002 Ohio App. LEXIS 459, at *17-18, citing Kokitka v. Ford MotorCo. (1995), 73 Ohio St.3d 89, 92-93, 652 N.E.2d 671.
 {¶ 89} Though the court's description of the "other purposes" for which the other acts evidence could be used is not a model of clarity, it nonetheless conveys that such evidence was only to be used to decide whether it proved "that which was sought to be proved" in each circumstance in which such evidence was offered (e.g., that appellant shopped for drugs at the East 11th Ave. home in the days before the murders, that appellant trafficked in drugs with many of the witnesses.) We are unpersuaded that the court's instruction, taken as a whole, was misleading or confusing.
 {¶ 90} More importantly, however, even if the court's instruction does constitute error, appellant cannot show that it affected the outcome of his trial. The jury was presented with the testimony of two people who were engaged with appellant in an armed robbery on the night of the shootings, who were present with appellant moments before he shot the victims, and to whom appellant said he "had to do it." The jury also heard from several witnesses (Radcliff, Runyan and Patterson) to whom appellant allegedly confessed. In addition, appellant admitted that he had been to the East 11th Ave. home several days prior to the shootings to look at some drugs in contemplation of purchasing them. The evidence against appellant was overwhelming; thus, any error in instructing the jury on the proper treatment of "other acts" evidence did not affect the outcome of the trial.
 {¶ 91} Appellant argues that the trial court committed plain error in failing to read to the jury the instructions for each separate count of kidnapping and for each separate count of aggravated murder, and that he received ineffective assistance when counsel failed to object. The record reveals that the trial court explained to the jury that there were two counts of aggravated murder corresponding to each victim for a total of six counts of aggravated murder. The court also explained that there was one count of kidnapping corresponding to each victim for a total of three counts of kidnapping. The court further instructed the jury as to the definitions of each of the elements of aggravated murder and of kidnapping. The court explained:
 Ohio has different levels of murder. And they start off with murder, which is the purposely causing the death of another. That's murder.
 Then if you add to murder prior calculation and design, that becomes aggravated murder. Or if you add to murder, while committing aggravated burglary, aggravated robbery and/or kidnapping, that amounts to aggravated murder.
 So we have one count with each victim of murder plus prior calculation and design leading to that and we have a second count dealing with the same victim, being murder, purposely causing the death of another, plus this [referring to visual aid], leading to aggravated murder. So that's how we get six counts.
 Now, in each one of the six counts, we have what are called specifications. And I'll go through those with you.
 * * *
 But I'm going to go through these with you. And I'm not going to repeat them six times. I'm just going to go through — and obviously we are dealing with three victims and two different counts.
 Aggravated murder. Before you can find the defendant guilty, you must find the State has proved beyond a reasonable doubt that on or about July 23, 2003, in Franklin County, Ohio, that the defendant, Vernon Spence, was 18 years old or more at the time, and as I said, it's alleged that he was the principal offender, that he purposely — and either, with calculation and design to cause the death, one, in Counts One, Kayla Hurst, Count Three, Eric Hlass and Count Five, Aaron Grexa.
 Purposely with prior calculation and design caused the death of another. That's those three counts. Or in Counts Two, Four and Six that the defendant, on or about July 23, 2003, in Franklin County, Ohio, that he was 18 years of age or older and he was the principal offender and that he purposely caused the death of another while committing the offenses of kidnapping, aggravated robbery and/or aggravated burglary.
 * * *
 Kidnapping. There are three counts of kidnapping dealing with each victim. Count Ten deals with Miss Hurst — pardon me — Count Nine deals with Miss Hurst, Count Ten deals with Mr. Hlass and Count Eleven deals with Mr. Grexa.
 * * *
 As I said, the verdict forms are dealing with each count. I'm going to go through one and explain it to you because there is one thing I have not gone over with you.
(Tr., 889, 891-892, 901, 907.)
 {¶ 92} Appellant does not cite any authority in support of his argument that it is error for a court to instruct a jury only once as to an offense with which a defendant has been charged multiple times, and we are unaware of any such authority. "It is fundamental that jury instructions must be considered as a whole." State v. Jackson (2001),92 Ohio St.3d 436, 446, 751 N.E.2d 946. When the jury instructions in this case are read as a whole, we find no error in the charge. Therefore, we reject appellant's argument that defense counsel's failure to object to this instruction constituted ineffective assistance of counsel.
 {¶ 93} Appellant also argues that the court committed plain error in failing to separately read to the jury the verdict forms corresponding to each count of aggravated murder, and in failing to read to the jury any of the verdict forms corresponding to the counts of aggravated robbery, aggravated burglary and kidnapping. He also claims he received ineffective assistance of counsel when counsel failed to object to the fact that the court did not read each and every verdict form to the jury. He states that because of the court's failure to read each verdict form separately the jury did not fully understand its duty to consider each and every count in the indictment as they related separately to each victim. Appellant cites no authority in support of his position that error occurred.
 {¶ 94} The record reveals that the trial court explained:
 On the verdict forms I differentiate not only the victim, but I differentiate how the theory of aggravated murder is.
 So on Count One it says Kayla Hurst, parens prior calculation and design. And the next one on Count Two says Kayla Hurst while committing the offenses of aggravated burglary, aggravated robbery and kidnapping. So you can tell those differences.
(Tr., 896.)
 {¶ 95} There is no indication in the record that the jury did not understand its duty to consider every count in the indictment separately with respect to each victim. We conclude that the trial court committed no error in failing to separately read to the jury each verdict form. Accordingly, counsel was not ineffective for failing to object to the way in which the court instructed the jury regarding the verdict forms.
 {¶ 96} Appellant further argues that the trial court committed plain error in failing to charge the jury on the lesser included offense of murder until after the jury had begun to deliberate. Appellant also argues that his counsel was ineffective for failing to object to the trial court's failure to instruct on the lesser included offensebefore the jury retired to deliberate. Appellant concedes that the court's instruction was complete and he does not specifically state how the timing of the instruction constituted error, or how such error, if any, prejudiced him, except to argue that the jury deliberated for two hours without the definition of murder.
 {¶ 97} The record reveals that the court included within its pre-deliberation instructions to the jury an instruction that the jury could find appellant not guilty of any count of aggravated murder but guilty of the lesser included offense of murder. Also at that time, as reprinted supra, at ¶ 87, the court defined the lesser included offense of murder as "purposely causing the death of another[.]" When the jury returned from its lunch break, the court told the jury that it would be receiving a transcript of the jury instructions for its use during deliberations, as well as some audiovisual equipment with which it could replay audio-and videotape evidence. In addition, the court stated:
 Now, one other thing I didn't say specifically, even though I did tell you, is that if you get to the point where you're dealing with the lesser included offense of murder, before you can find the defendant guilty of a lesser included offense of murder, you must find the State has proved beyond a reasonable doubt that on or about July 23, 2003, in Franklin County, Ohio, that the defendant purposely caused the death of another. And that's one of the three victims and that all six of the lesser included offenses.
 I told you murder was the purposely causing the death of another, but I didn't tell you specifically what they have to prove beyond a reasonable doubt.
 So now that I've done that, go ahead and step back in there.
(Tr., 920-921.)
 {¶ 98} Many Ohio courts of appeals have held that, as a general principle, supplemental instructions to a jury after deliberations have begun are not per se prejudicial. See e.g., State v. Hicks (Mar. 26, 1990), 2nd Dist. No. 11567 ("Supplemental instructions to a jury after deliberations have begun are not per se prejudicial.");State v. Hairston (1977), 60 Ohio App.2d 220, 225, 14 O.O.3d 191,396 N.E.2d 773; State v. McGrath (Nov. 19, 1985), 4th Dist. No. 1218; State v. Fannin (Oct. 9, 1987), 6th Dist. No. OT-87-9 ("It is an appropriate action for the trial court to recall a jury to give them a corrected instruction."); State v. Taylor (Aug. 5, 1976), 8th Dist. No. 35109; State v. Golden Charities,Inc. (May 24, 1978), 9th Dist. No. 8639; State v.Morgan (Sept. 30, 1991), 11th Dist. No. 90-A-1554 ("[A] trial judge may give additional instructions after the jury has begun deliberating."); see, also, State v. Moorehead (May 9, 1996), 10th Dist. No. 95APA09-1116.
 {¶ 99} "If from the entire charge it appears that a correct statement of the law was given in such a manner that the jury could not have been misled, no prejudicial error results." State v. Hardy (1971),28 Ohio St.2d 89, 92, 57 O.O.2d 284, 276 N.E.2d 247. In the present case, the court gave the jury a complete and correct instruction on the lesser included offense of murder, and did so in such a manner that the jury could not have been misled. Accordingly, we find no prejudicial error and thus no plain error or ineffective assistance of counsel.
 {¶ 100} For all of the foregoing reasons, appellant's fourth and fifth assignments of error are overruled.
 Sixth Amendment {¶ 101} In support of his sixth assignment of error, appellant argues that, pursuant to the holdings of the United States Supreme Court inApprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348,147 L.Ed.2d 435, and Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403, the trial court committed reversible error in sentencing appellant to maximum sentences for his aggravated robbery, aggravated burglary and kidnapping convictions, and in ordering that all sentences be served consecutively, based upon facts not found by a jury beyond a reasonable doubt.
 {¶ 102} In the case of State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, 845 N.E.2d 470, "the Supreme Court of Ohio determined that portions of this state's sentencing statutes violate theSixth Amendment to the United States Constitution in the manner set forth inApprendi v. New Jersey (2000), 530 U.S. 466, 120 S. Ct. 2348,147 L. Ed. 2d 435, and Blakely, supra." State v. Draughon, 10th
Dist. No. 05AP-860, 2006-Ohio-2445, ¶ 5. "As a result ofFoster, the offending provisions of Ohio's sentencing statutes were severed with the result that trial courts now 'have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than minimum sentences.'" State v. Hughes, 10th Dist. No. 05AP-1286, 2006-Ohio-5411, ¶ 24, quotingFoster, supra, at paragraph seven of the syllabus.
 {¶ 103} Appellant recognizes the holding in Foster, but argues that R.C. 2929.14(B), (C) and (E) should be strictly construed against the state and, thus, the Supreme Court of Ohio in Foster erred in excising the entirety of these statutes. Therefore, he argues, the portions of these statutes that require that those who have never before served a prison term must be given minimum and non-consecutive sentences should still be applied in this case, and we should remand the case, pursuant to Foster, and require that the trial court support any non-minimum and consecutive sentences with the appropriate findings required by the language of the statutes that Foster excised.
 {¶ 104} The record discloses that appellant never raised theBlakely issue in the trial court and he has therefore waived the issue on appeal. Draughon, supra, at ¶ 7-8; see, also, State v. Jordan, 10th Dist. No. 05AP-1330, 2006-Ohio-5208, ¶ 41. Even if he had preserved this issue, we would be bound to apply Foster as it was written. Sant v. Hines Interests Ltd. Partnership, 10th
Dist. No. 05AP-586, 2005-Ohio-6640, ¶ 19 ("[W]e [are] bound to follow precedent set by the Supreme Court[.]") For these reasons, appellant's sixth assignmentof error is overruled.
 Merger {¶ 105} In support of his seventh assignment of error, appellant argues that the trial court erred in failing to merge the three kidnapping counts into the aggravated robbery count for purposes of sentencing. Specifically, he contends that the kidnappings were only committed to facilitate the aggravated robbery and that there was, therefore, no animus for the kidnappings that was separate and distinct from the animus for the aggravated robbery. In response, the state argues that kidnapping and aggravated robbery are not allied offenses of similar import and appellant committed the kidnappings with a separate animus from that with which he committed the aggravated robbery.
 {¶ 106} Section 2941.25 of the Ohio Revised Code, Ohio's allied offense statute, protects against multiple punishments for the same criminal conduct, which could violate the Double Jeopardy Clauses of the United States and Ohio constitutions. It provides, as follows:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where this conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
 {¶ 107} In the case of State v. Rance (1999), 85 Ohio St.3d 632,710 N.E.2d 699, the Supreme Court of Ohio held that analysis under R.C.2941.25 is a two-step process. First, courts must compare, in the abstract, the statutorily defined elements of offenses that are claimed to be of similar import. Id. at 638. "Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes 'correspond to such a degree that the commission of one crime will result in the commission of the other.'" Ibid., quotingState v. Jones (1997), 78 Ohio St.3d 12, 14, 676 N.E.2d 80. "[I]f the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus." Id. at 638-639.
 {¶ 108} We begin our analysis with the first step underRance. Appellant was convicted of aggravated robbery in violation of R.C. 2911.01(A), which provides, in relevant part:
 No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]
 {¶ 109} Appellant was also convicted of three counts of kidnapping in violation of R.C. 2905.01(A), which provides, in relevant part:
 No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 (1) To hold for ransom, or as a shield or hostage;
 (2) To facilitate the commission of any felony or flight thereafter[.]
 {¶ 110} In State v. Logan (1979), 60 Ohio St.2d 126, 14 O.O.3d 373,397 N.E.2d 1345, the Supreme Court of Ohio compared the elements of the two statutes and held that implicit within every robbery (and, thus, aggravated robbery) is a kidnapping. Id. at 130. This means that kidnapping and aggravated robbery are allied offenses of similar import and appellant may not be punished separately for these offenses unless he committed them with a separate animus.
 {¶ 111} Therefore, in order to determine whether the trial court should have merged appellant's kidnapping convictions with his aggravated robbery conviction, we must proceed to the second step of theRance analysis. The word "animus" in R.C. 2941.25 means purpose or immediate motive. Id. at 131. We must determine whether appellant committed the kidnappings of Hurst, Grexa and Hlass with a separate purpose or immediate motive from that with which he committed aggravated robbery.
 {¶ 112} With respect to what would later become the second step of theRance analysis, the Logan court held, at the syllabus:
 In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
 (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
 (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.
 {¶ 113} In the present case, though appellant's initial restraint of the victims facilitated the aggravated robbery, it was not merely incidental thereto. Appellant and his cohorts corralled the victims into two separate bedrooms and then, later, onto the floor of the same bedroom, and bound their hands and feet with speaker wire,after one of the victims had led the trio to the drugs and money that they sought through commission of the aggravated robbery. Thus, the restraint was extreme and prolonged and it substantially increased the terror and risk of harm to which the victims were exposed. It is clear that the kidnappings were committed with an animus that was independent from that with which the aggravated robbery was committed. Thus, the trial court did not err in refusing to merge the kidnapping counts into the aggravated robbery count. Accordingly, appellant's seventh assignment of error is overruled.
 {¶ 114} Having overruled all of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
[1] Brief of Appellant, at 17.
[2] Brief of Appellant, at 19.
[3] Reply Brief of Appellant, at 3.
[4] According to the State, Patterson was a party to a plea agreement, but that was in connection with a case in federal court and was unrelated to the present case. Our review of the record reveals no evidence of the terms of Patterson's federal plea agreement. Without such evidence we cannot assume that the agreement involved his testimony in the present case. There is no other evidence in the record to indicate that Patterson received any benefit in exchange for testifying against appellant.