[Cite as *State v. Kesman*, 2025-Ohio-5642.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

           Plaintiff-Appellee,            :

                                      Nos. 23AP-184
v.                                             :                 and
                                      23AP-713
                               (M.C. No. 2021 CRB 002341)

Jeffrey A. Kesman, Sr.,                        :       (REGULAR CALENDAR)

           Defendant-Appellant.           :

---

D E C I S I O N

Rendered on December 18, 2025

---

**On brief:** *Zachary M. Klein*, City Attorney, *Melanie R. Tobias-Hunter*, *Orly Ahroni*, and *Dave Pelletier*, for appellee. **Argued:** *Dave Pelletier*.

**On brief:** *Mitchell A. Williams*, Public Defender, and *Leon J. Sinoff*, for appellant. **Argued:** *Leon J. Sinoff*.

---

APPEALS from the Franklin County Municipal Court

DINGUS, J.

{¶ 1} Defendant-appellant, Jeffrey A. Kesman, Sr. ("Jeffrey"), appeals from a judgment of the Franklin County Municipal Court finding him guilty of four counts of endangering children in violation of R.C. 2919.22(A). Jeffrey additionally appeals from a subsequent judgment of the same court denying his motion for a new trial. For the reasons that follow, we affirm both judgments of the trial court.

## I. Facts and Procedural History

{¶ 2} This case involves the blended family of Sheila Kesman ("Sheila") and Jeffrey, which includes seven children born between 1999 and 2005.[1] Jeffrey had two children from

---

[1] We have chosen to use the fictitious names Alice, Bella, Caroline, Daniel, Eli, Frank, and Gabriel to protect the identities of the seven children.

a previous relationship: Alice and Bella. Sheila had four children from a previous relationship with Shade Carter, Sr. ("Shade"): Caroline, Daniel, Eli, and Frank. Jeffrey and Sheila had one child together: Gabriel. The criminal charges in this case involved three of the children: Frank, Eli, and Bella.

## A. Police involvement

{¶ 3} The first police contact related to the charges was in April 2020, at which point Caroline was 21 years old, Alice was 20, Daniel was 19, Eli and Bella were 18, Frank was 16, and Gabriel was 14. Daniel, Frank, and Gabriel were still living in the home at the time. The oldest children, Caroline and Alice, had moved out of the Kesmans' home around 2017. Jeffrey and Sheila ejected Bella and Eli from the home earlier in April 2020, and Sheila obtained civil protection orders ("CPOs") against Bella, Eli, and Alice. Sheila included Frank as a protected party in the CPO against Eli.

{¶ 4} According to the police, they responded to a call on April 16, 2020, and spoke with Bella, Alice, and a woman identified as their former foster mother. Bella and Alice made allegations of persistent deprivation, confinement, and abuse at the Kesmans' residence. The police were called to the Kesmans' residence for a well-being check on the two minors still living there, Frank and Gabriel. Daniel emerged from the house and said that the Kesmans were not at home. He stated that Sheila had gotten CPOs against Eli, Bella, and Alice because they tried to kill Sheila by putting pills in her coffee pot. Police noted that in 2018, Daniel made abuse allegations against the Kesmans that were similar to the current allegations. Daniel responded that his allegations had been false, though he also mentioned that he made them to justify running away from home because he did not feel safe there at the time.

{¶ 5} After the police were able to speak with Frank separately, they suspected that Bella and Alice's allegations might be true. The police returned the next day with Franklin County Children's Services ("FCCS") to remove Frank and Gabriel from the home. Among other things, the Kesmans urged the officers to review 2017 home surveillance footage, which the Kesmans maintained showed that one or more of the children tried to poison them by putting pills in their coffeemaker. The police did not believe that the footage supported the Kesmans' claims, but it led them to believe that the Kesmans regularly monitored and recorded the children in the house using video surveillance.

{¶ 6}   Police had the Kesmans leave the house and secured the house while others in the department gathered more information.  Police interviewed Caroline, Frank, and Gabriel, and went on to obtain a search warrant the following day.  Police seized computers, data-storage devices, and other items from the house.  Bella, Eli, and Frank later underwent forensic interviews and medical examinations at the Child Advocacy Center at Nationwide Children's Hospital ("CAC").

**B. The charges**

{¶ 7}   In February 2021, plaintiff-appellee, the State of Ohio, filed 18 misdemeanor charges against Jeffrey: five counts of domestic violence in violation of R.C. 2919.25(A), five counts of assault in violation of R.C. 2903.13(A), and eight counts of endangering children in violation of R.C. 2919.22(A).  The dates of the alleged offenses varied, but in all they spanned a period from 2014 to 2020.  The probable cause affidavit filed with the criminal complaints stated that FCCS had been involved with the Kesmans' family since 2002, that the children had been placed in foster care around 2009 to 2012, and that some of the children alleged that the Kesmans' abuse had gotten worse and had been ongoing since the children's return to the Kesmans' custody.

{¶ 8}   The parties stipulated that the cases against Jeffrey and Sheila would be joined for purposes of trial.  The Kesmans successfully moved to suppress evidence that the police seized from the Kesmans' residence, on the grounds that the police seized the Kesmans' home for a constitutionally unreasonable amount of time before obtaining a search warrant.  The Kesmans also moved to dismiss a majority of the charges as being past the two-year statute of limitations.  They noted that FCCS had been repeatedly notified of suspected abuse and neglect of the Kesmans' children over the years, with the most recent case having closed in January 2019.  Accordingly, although the statute of limitations would normally be tolled for minors, such tolling did not apply here pursuant to R.C. 2901.13(J)(2).  The parties agreed that ten of the charges against Jeffrey would be dismissed, and that the state would amend the dates on three of the charges pursuant to Crim.R. 7(D).  The remaining eight charges against him included two counts of domestic violence, two counts of assault, and four counts of endangering children.  After a similar agreement to dismiss and amend charges against Sheila, the remaining charges against her were four counts of endangering children.

{¶ 9}    The Kesmans waived their right to a jury, and the matter proceeded to a bench trial in January 2023.

**C. The trial**

{¶ 10} At trial, the state argued that Jeffrey committed domestic violence and assault against Eli in 2019 by putting a staple into his chin, and in 2020 by kicking and punching him.  The state argued that Jeffrey and Sheila committed child endangering against Bella, Eli, and Frank from February 2019 to April 2020 by depriving them of adequate food, bedding, bathroom access, medical and dental care, and education; by keeping them locked in a room; and by punishing them by making them kneel in front of a wall.  And Jeffrey and Sheila committed further child endangering against Eli in March to April 2020 by starving him.  The defense argued that the children fabricated their allegations to retaliate against the Kesmans for obtaining CPOs against Bella and Eli.  The defense asserted that the children were repeating the same false allegations that Daniel had made in 2018 when he attempted to run away to live with his biological father, Shade.

{¶ 11} The state presented the testimony of the following witnesses: (1) Eli; (2) Frank; (3) Bella; (4) Ashley Cooley, forensic interviewer and mental health advocate who interviewed Bella and Frank; (5) Kerri Wilkinson, a social worker who interviewed Eli; (6) Katharine Doughty, a pediatric nurse practitioner who examined Bella; (7) Dr. Kristin Crichton, a pediatrician who examined Frank; and (8) Officer Andrew Fogle, a Columbus police officer who was involved in removing Frank and Gabriel from the Kesmans' home.  Witnesses for the defense included: (1) Daniel; (2) Jeffrey; and (3) Danielle Mackey, an intake caseworker at FCCS who had responded to Daniel's allegations in November 2018.

**1. The state's case in chief**

{¶ 12} Eli testified that in 2019 and 2020 he lived with the Kesmans at a house on Grasmere Avenue in Columbus, Ohio.  During those dates, he was enrolled at an online school, but he was denied access to a computer and was not allowed to complete any academic work.  He did not know what grade he was in for the 2019 through 2020 school year.  He could not remember when he last attended a physical school, but he thought it might have been in the third grade, or around the time he left foster care and returned to the Kesmans' custody.

{¶ 13} Eli testified that he, Bella, and Frank were confined together in a bare room that was locked from the outside, with the vent covered with a thick piece of wood and the windows covered with plywood and a blanket. He was not permitted to leave the house, to have friends, or to have contact with his adult siblings. He testified that he did not receive medical or dental care or have access to basic hygiene items such as toothbrushes or soap. The three siblings had minimal clothing, no bedding, no furniture, and they rarely had access to a shower. They were allowed to use the bathroom once a day, and they sometimes ended up having to urinate or defecate on the floor in an area where there was a hole about the size of a quarter that led to the basement. Eli said that Bella would press their feces down the hole with her fingers, and he recounted an instance when the mess was discovered in the basement and the three children were beaten. They received peanut butter sandwiches and water once a day. They sometimes resorted to eating dog food, which Frank would steal when he was allowed out of the room to do chores. Eli testified that Gabriel did not receive the same treatment, and that Daniel assisted his parents with the confinement of the three siblings.

{¶ 14} Eli testified that the Kesmans punished the three siblings by making them stand facing a wall or kneel on a furnace grate for hours, by hitting and kicking them, and by beating them with a switch or a two-by-four. He stated that on one occasion, Jeffrey struck him in the face with a stapler, lodging a staple in his chin, after Eli protested Sheila's accusations that the siblings were tampering with the window and door. He described another occasion when Jeffrey beat him to the point of unconsciousness. Eli did not report the abuse to caseworkers who visited the home over the years because the Kesmans threatened him and would not permit him to talk to the caseworkers alone. He described the Kesmans getting furniture from Craigslist and staging the house to conceal their treatment of the kids from the caseworkers who visited in 2018.

{¶ 15} Eli testified that soon after he turned 18 years old, police came to the house to serve him with some papers, though he did not understand the import of the papers at the time. Sheila then drove Eli and Bella to a park in downtown Columbus and left them there with no identification, no money, and no coats. Daniel apparently contacted Shade at some point, and Shade's new wife came to the park and retrieved Eli and Bella. Eli

testified that he weighed 70 pounds when he left the Kesmans' residence, and that he now weighs 145 pounds.

{¶ 16} On cross-examination, Eli detailed the locking mechanism and screws that the Kesmans used to lock the door to the room, as well as the cordless drill that Jeffrey used. He also detailed his confinement in a different house in 2018 and explained that his room had two doors, one of which the Kesmans secured by installing 28 screws. He agreed that the holes left by such hardware would be visible to someone inspecting the house. He acknowledged inconsistencies in his descriptions about the frequency and amount of food and water the children received, as well as the methods the children used for tallying the days that passed. When asked about medical records indicating that he weighed 118 pounds rather than 70 pounds in April 2020, Eli maintained his recollection but acknowledged the discrepancy. Eli admitted to fabricating allegations of sexual misconduct against his father, Shade, in 2018, but he stated that Sheila coerced him into making the allegations when caseworkers were investigating Daniel's running away.

{¶ 17} Eli acknowledged inconsistencies in his description to the CAC of Jeffrey assaulting him on April 1, 2020, but he explained that his narrative covered the many assaults that he suffered over the course of two years. When asked about bleeding on the floor after a particular assault, Eli provided combined details from two different assaults in two different houses. When pressed more about the details and dates of the assaults, Eli replied "I'm not going to know what year -- or what day it is if I'm getting beat and I'm locked in the room, and I'm not going to understand or know -- [i]f I don't got a cell phone or electronic, I ain't gonna know what time it is or day it is, you know?" (Jan. 31, 2023 Tr. Vol. I at 149.) He agreed that his injuries from the assault on April 1, 2020 should be visible in his photos from the CAC later that month. The defense later presented a picture of Eli's face to Frank and had him confirm that no bruising was apparent.

{¶ 18} Frank provided testimony that was similar to Eli's testimony in most respects. He detailed his experiences in 2019 and 2020 of being locked in a bare room and denied access to education, people outside the home, medical and dental care, and adequate clothing, bedding, hygiene, and food. And he described physical abuse by the Kesmans and being forced to spend hours kneeling on a grate with his hands in the air as punishment. He indicated that Gabriel did not receive the same treatment, and that Daniel assisted his

parents. He described being let out to do chores such as getting the mail, mopping the floor, and cleaning cat litter boxes. Frank testified that the children sometimes ate dog food, and they would scan the house for food anytime the opportunity arose. Frank testified that he weighed 86 pounds when he left the Kesmans' residence, and that he now weighs 135 pounds. He testified that he thought about killing himself. He described feeling stuck in a cycle where the children would try to report abuse, officials would not act on the allegations, and the Kesmans would continue their abuse.

{¶ 19} Frank's accounts differed from Eli's testimony in certain respects, such as his explanation that the children were allowed to use the restroom twice a day rather than once a day. He provided a different description of the mechanism used to lock the children in the room, stating that there was a hook and a bungee cord. He testified that the door to the room was not always secured, but that the children were expected to stay in the room either way. He said the windows, rather than the doors, were drilled shut. On cross-examination, Frank acknowledged inconsistencies in previous and current accounts about how many peanut butter sandwiches the children received each day. He later explained that the children did not always receive the same amount of food each day, and that sometimes the Kesmans withheld food as punishment.

{¶ 20} Bella provided testimony that was similar to Frank and Eli's testimony regarding the children's confinement, isolation, and deprivation. She described beatings, as well as hours of wall-standing and grate-kneeling as punishment. She testified that the Kesmans would only allow her to participate in online schooling if they were able to monitor her and ensure that she did not contact anyone on the computer. She described helping her brothers when they used the bathroom on the floor and attempting to take the blame to protect them. Bella testified that after she reached puberty, she only menstruated intermittently, sometimes going months or over a year without having a period. When she did menstruate, the Kesmans did not provide her with feminine care products or allow her to adequately clean herself. Bella described being served with papers and removed from the house along with Eli in April 2020. She testified that after she got away and was given normal food, she vomited uncontrollably. After being away from the Kesmans' household for a month, her period resumed.

{¶ 21} On cross-examination, the defense pressed Bella on her differing description of rooms having carpeting versus hardwood floors. The defense also highlighted variations in the victims' testimony about the exact amount of food the children were given each day, the way that they kept track of time, and the location where the family was living when Bella last menstruated. Bella described living in several houses prior to 2020, including houses on Grasmere Avenue, Seymour Avenue, and South 22nd Street.

{¶ 22} The state provided the testimony of various professionals who were responsible for interviewing and examining the three children in April 2020, though the state did not present any witness who had completed a medical examination of Eli. One witness testified that Bella was amenorrheic, in the 16th percentile for weight, and in need of dental and medical attention. Bella had a swollen ankle and elevated liver enzymes, which indicated malnutrition. Frank was at the bottom of the first percentile for weight. Apart from Frank's scars from self-inflicted injuries, the children had no other visible signs of injuries at the time of their interviews.

{¶ 23} Finally, the state presented the testimony of Officer Andrew Fogle, who performed the well-being check at the Kesmans' residence and later removed Frank and Gabriel from the home in April 2020. He described going to the Kesmans' house on April 16, 2020 and noticing an unpleasant ammonia-like smell coming from the house before he even reached the front porch. He noted Frank's meek, submissive demeanor as a classic potential indicator of abuse based on his domestic violence training. After Frank was removed from the house and disclosed the Kesmans' abuse, he was trembling and terrified at the thought of the Kesmans finding out about his disclosures. When Officer Fogle returned to the Kesmans' house for a walk-through with FCCS, he saw trash bags in the Kesmans' truck and noted that the house smelled like cleaning products. There was water on the floor in the basement, and Officer Fogle did not believe that the water was due to flooding as he did not remember a recent rainstorm. Officer Fogle described the Kesmans showing him the 2017 surveillance video of some of the children, and he found it strange that two of the children in the video were standing facing a wall.

### 2. The defense's case in chief

{¶ 24} Daniel testified that the children at the Kesmans' home had normal access to food, hygiene, bedding, education, and TV entertainment. None of the children were locked

in any room. He refuted his siblings' accounts of bathroom access and denied that there was ever urine or feces in the basement. He testified that Eli and Bella were the aggressors in the household, that Bella was physically abusive to her mother, and that Eli was a pyromaniac. Daniel acknowledged that when he ran away around 2018, he accused the Kesmans of confining, neglecting, and abusing the children. He said that his accusations were false, and that his biological father, Shade, had coerced him into running away. He said that he later returned to the Kesmans' household and recanted his allegations after Shade abandoned him at a courthouse and left him with nowhere to go.

{¶ 25} Danielle Mackey testified that she was the FCCS caseworker who investigated a report regarding the Kesmans in November 2018 when Daniel ran away from the Kesmans' home. The case file indicated that a report came in on November 24, 2018, and that Mackey arranged a scheduled visit at the Kesmans' household on November 30, 2018. Mackey conducted a walk-through of the Kesmans' home and did not note anything indicating that the children were abused, confined, or deprived of food. She did not observe any screw or nail holes on the interior doors. The Kesmans did not allow Mackey to speak to the children outside of the Kesmans' presence, and they refused to sign a release of information regarding the children's school attendance. The Kesmans admitted to locking the refrigerator and cabinets in the past, but they stated that they had to do so to keep Bella from eating everything in the house. The Kesmans admitted that they did not allow the children to leave the home, citing safety concerns. Mackey extended her investigation to the 60-day maximum, but because she was unable to locate Daniel and because the other children did not report abuse at the time, Mackey closed the case.

{¶ 26} Jeffrey took the stand and denied that he confined the children or limited their food. He testified that he and Sheila decided to have all of the children attend online schooling at home after Gabriel developed epilepsy. He said that he and Sheila wanted to monitor Gabriel and "it was just easier to have them all in one place." (Feb. 2, 2023 Tr. Vol. IV at 704.) He admitted that none of the children completed high school while in his care. He did not know what grade Frank was in when he left the home in April 2020, and he stated that he had too many children to be able to keep track of their grade levels.

{¶ 27} Jeffrey testified that he loved to cook and described making a variety of meals for the family, including pot roast, pasta, and steak. He indicated that the children were

skinny due to genetics rather than food deprivation. He admitted to placing a lock on a refrigerator at one point, but he said it was at a time when the family owned two refrigerators, and it was only a temporary measure to secure Gabriel's medication until Jeffrey obtained a lockbox. When shown a caseworker report indicating that Jeffrey claimed that he had been advised to lock the refrigerator due to Bella eating everything, Jeffrey said he did not recall saying such a thing.

{¶ 28} Jeffrey testified that Sheila obtained CPOs against Bella and Eli in April 2020 because they refused to move out of the house, and also because they harmed Sheila. He mentioned that Sheila also obtained a CPO against Alice in April 2020, but he did not explain why. He admitted that he used to hit the children, but he testified that he did not do so during the dates of the charged offenses.

### 3. Verdict and sentencing

{¶ 29} The trial court announced its verdicts from the bench. The court concluded that the state had not proven the assault and domestic violence offenses beyond a reasonable doubt, and it therefore entered not guilty verdicts. The trial court found Jeffrey guilty on the four counts of endangering children. At a subsequent sentencing hearing, the trial court merged one of the counts of endangering children, leaving three counts for sentencing. The court imposed maximum jail terms of 180 days on each of the three counts and ran them consecutively for a total aggregate sentence of 540 days.

{¶ 30} Jeffrey appealed his convictions and sentence, and this court granted his motion to stay the sentence pending the outcome of the appeal.

## D. The motion for a new trial based on newly discovered evidence

{¶ 31} While Jeffrey's appeal was pending, the Kesmans jointly filed a motion for a new trial based on newly discovered evidence. They alleged that on the day after sentencing, the defense discovered that in September 2022, Eli had been arrested on a criminal charge in Clark County for violating Sheila's CPO. Eli was accused of violating the CPO by being in contact with Frank, whom Sheila had listed as a protected party. The defense confirmed that the brothers had been in contact by interviewing Eli's ex-fiancée, Madison Ward, who had still been in a relationship with Eli during the Kesmans' trial. The defense further discovered that one of the prosecutors in the Kesmans' case, Mary Caswell,

had made calls to Clark County inquiring if Eli could be released from jail on a summons pending his arraignment.

{¶ 32} The Kesmans alleged that Frank testified at trial that he had not been in contact with Eli at all since the CPO was put in place. They asserted that the new evidence proved that Frank had perjured himself and that the state had failed to uphold its duty to correct Frank's false testimony. The Kesmans argued that Frank's testimony destroyed the defense's theory of the case that the children conspired to fabricate their allegations against the Kesmans. They argued that a new trial was required to allow them to present a defense with the knowledge that Frank and Eli were in contact between April 2020 and January 2023, and to allow them to explore whether Eli had been compromised by any deals with the state regarding his Clark County case.

{¶ 33} At the hearing on the Kesmans' motion for a new trial, the trial court heard testimony from three witnesses: (1) Madison Ward, Eli's ex-fiancée; (2) Elizabeth Flanagan, the domestic violence advocate assigned to the Kesmans' case; and (3) Mary Caswell, the Director of the Domestic Violence and Stalking Unit at the Columbus City Attorney's Office, who was one of the prosecutors on the Kesmans' case. Ward testified that when Eli was arrested in Clark County, she called Flanagan in Columbus. Ward testified that Eli later told her that Flanagan came to Clark County and helped to get him released on a recognizance bond. Flanagan confirmed that Ward called her about Eli's arrest, but she told Ward she was not an attorney and could not help, and she did not contact anyone in Clark County. She did, however, provide the information to Caswell, who called the police in Clark County to verify. Caswell testified that she provided police and a local prosecutor with the background of the Kesmans' case, along with her view that the basis of the CPO against Eli was fraudulent. Caswell testified that she had no further interactions with anyone in Clark County about Eli's case. She testified that she did not inform Eli of her actions, let alone make any deal with him related to her actions. Caswell additionally testified that she saw Eli and Frank together during a video call in the summer of 2022. She had no knowledge of the brothers being together aside from the video conference and Eli's arrest.

{¶ 34} In addition to the foregoing testimony, the parties reviewed an excerpt from Jeffrey's trial in which Frank was alleged to have perjured himself. In the excerpt, Frank

testified that he was able to access social media for the first time once he moved in with a foster family around May 2020. The defense inquired about his contacts with family via social media:

> Q: Okay. While you're setting up that Facebook account, I assume you befriend [Eli]; right?
>
> A: Yes, I friended him.
>
> Q: You friend [Bella]?
>
> A: I friended [Bella].
>
> Q: You friend [Alice]?
>
> A: Yes -- yeah.
>
> Q: You friend [Caroline]?
>
> A: Not at the time.
>
> Q: Did you friend Shade?
>
> A: Yes, I friended Shade.
>
> Q: Okay. Now, if you guys were friends, you guys can then talk to each other; right?
>
> A: Yes.
>
> Q: And so, I assume, you're talking on Instant Messenger at that point?
>
> A: Yes.
>
> Q: How often would you say you're talking to them?
>
> A: To who?
>
> Q: The people I just mentioned, your family that you had friended.
>
> A: I don't talk to [Alice] no more. I don't talk to [Caroline]; can't get ahold of [Bella]. [Eli], not so much -- at all, really.
>
> Q: Would you say you talk to them less now and more after you first left?
>
> A: Yeah, since this CPO has been put in place, but I'm going to get that dropped in February, so . . .

(Jan. 31, 2023 Tr. Vol. II at 314-315.)

{¶ 35} Finally, Ward testified about an additional matter that was not mentioned in the new-trial motion; she stated that Eli and Frank communicated prior to trial to "get their stories straight." (Aug. 23, 2023 Tr. at 15.) Specifically, she testified that they decided that

they would not mention eating dog food in their testimony. When asked what Eli and Frank had personally told her about their childhoods, Ward provided details that were consistent with Eli and Frank's trial testimony.

{¶ 36} The trial court found that Frank's above-quoted trial testimony indicated that Frank had some contact with Eli, rather than no contact at all. It concluded that because Frank's testimony was not false, the state was not obligated to correct it. The court found that the evidence that Eli and Frank "were in fact in contact does not change how the Court would have viewed their testimony." (Nov. 13, 2023 Decision & Entry at 7.) It also held that it "gives no credence to the insinuation that [Eli's] testimony was influenced by what he may (or may not) have believed [Caswell] did in relation to [the Clark County CPO] case." *Id*. at 6. It noted that "the only evidence Defendants produced showing that [Eli's] testimony may have been influenced by [Caswell]'s actions with the Clark County case is [Ward]'s testimony that [Eli] thought [Flanagan] got him out of jail." *Id*. at 7. Finally, the court expressed doubts about Ward's credibility and otherwise noted that her account of the brothers' childhood did not conflict with the testimony at trial. The trial court concluded that even if Ward had provided the same testimony at the January 2023 trial, the information would not have changed the court's view of the brothers' trial testimony. Accordingly, the court denied the Kesmans' motion for a new trial.

**E. Jeffrey's appeal**

{¶ 37} Although Jeffrey's direct appeal was already pending by the time he filed his motion for a new trial, this court stayed appellate proceedings and instructed the parties to file a motion to reactivate or dismiss the appeal after the trial court entered judgment on the motion for a new trial. Upon completion of the new-trial proceedings, Jeffrey filed a notice of appeal, a motion to reinstate the previous proceedings, and a motion to consolidate his two appeals. This court granted the motions and consolidated Jeffrey's appeals in case Nos. 23AP-184 and 23AP-713. We also granted Sheila's identical motions and consolidated her appeals in case Nos. 23AP-185 and 23AP-716. We coordinated the two consolidated cases for purposes of oral argument.

**II. Assignments of Error**

{¶ 38} Jeffrey assigns the following three assignments of error for our review:

> [I.] The Kesmans' Convictions are Contrary to the Manifest Weight of the Evidence.

[II.] The State's Wrongful Suppression of Discoverable, Favorable, Material *Brady* and *Giglio* Information Deprived the Kesmans of their Constitutional Rights to a Fair Trial, to Present a Full and Meaningful Defense, to Fully Confront Their Accusers Through Cross-Examination, and to Due Process of Law.

[III.] The Trial Court Abused its Discretion in Denying the Kesmans' Motion for New Trial.

(Sic passim.)

## III. Discussion

### A. Manifest weight of the evidence

{¶ 39} In his first assignment of error, Jeffrey asserts that his convictions for endangering children are against the manifest weight of the evidence. When deciding if a conviction is against the manifest weight of the evidence, a reviewing court must determine " 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A manifest-weight challenge can succeed " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 40} The trial court found Jeffrey guilty of endangering children in violation of R.C. 2919.22(A), which prohibits a person from "creat[ing] a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." The culpable mental state for the offense of endangering children under R.C. 2919.22(A) is recklessness. *State v. McGee*, 1997-Ohio-156, syllabus. Jeffrey does not argue that the confinement and deprivation alleged in this case fell short of constituting a substantial risk to the children's health and safety or that his actions fell short of being reckless; he argues that the allegations were simply false.

{¶ 41} Jeffrey asserts that the record is devoid of evidence to corroborate the children's allegations. We do not find that to be the case. Medical evidence corroborated the allegation that the children were deprived of adequate nutrition. One of the CAC examiners testified that Bella's leg and ankle swelling, elevated liver enzymes, and amenorrhea were abnormal and indicated malnutrition. Eli and Frank were below average

weight, with Frank at the bottom of the first percentile, and both gained significant weight after living outside the Kesmans' home. The children's testimony, itself, corroborated the claim that Jeffrey deprived the children of an education. Eli did not know how many days are in two weeks or how many months are in one year. He was not familiar with the word "accurate." (Jan. 30, 2023 Tr. Vol. I at 170.) All of the children had difficulty at times explaining abstract concepts, providing appropriate context in narratives, placing events in chronological order, and understanding complex questions.

{¶ 42} Next, Jeffrey points out various alleged inconsistencies in the children's testimony. He notes that Bella mentioned tallying days on the wall with a pencil and on the floor with a staple, and that Frank mentioned marking days on a cabinet using a curtain staple. The children also provided varying accounts of the mechanism used to lock them in their room, the frequency of bathroom access, the timing of Bella's periods, and varying accounts regarding the amount, consistency, frequency, and timing of their meals. Jeffrey asserts that the only possible explanation for the children's inconsistencies is fabrication. We disagree.

{¶ 43} It is likely that the children were not treated precisely the same every day from February 2019 to April 2020. The children's testimony confirmed that their treatment varied from time to time. For example, the children testified that the Kesmans would sometimes provide less food than usual if they were low on supplies, and they would sometimes withhold food as punishment. The children indicated that they were sometimes allowed to use the bathroom additional times, though only if the Kesmans heeded their calls. The children's environment also varied; it appears to be undisputed that the Kesman family moved frequently. Jeffrey testified that they had moved into the house on Grasmere in November 2019, and that they lived in their previous home for six months. Daniel indicated that the family lived at a home on 22nd Street in 2018, then a house on Seymour, then on Republic in 2019, and on Grasmere from late 2019 to 2020. The children were understandably asked to testify about their circumstances in general terms rather than describing each individual day from February 2019 to April 2020. It is possible that the inconsistencies in their testimony were simply descriptions of specific, varying circumstances in otherwise generalized accounts of their daily lives.

{¶ 44} Even if variations in the children's testimony were truly inconsistencies, we cannot reverse a conviction on manifest-weight grounds merely because there were conflicts or inconsistencies in the testimony at trial. *State v. Scott*, 2019-Ohio-4175, ¶ 16 (10th Dist.). It was within the province of the factfinder to believe some or all of the prosecution witnesses' testimony and to give less weight to Jeffrey's testimony. *See State v. Antill*, 176 Ohio St. 61, 67 (1964) (a jury "may believe or disbelieve any witness or accept part of what a witness says and reject the rest"). "The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *State v. Rankin*, 2011-Ohio-5131, ¶ 29 (10th Dist.).

{¶ 45} We have reviewed the record in its entirety, and we conclude that the trial court did not lose its way in choosing to believe aspects of the children's testimony related to endangering children and to find less credible Jeffrey's testimony that none of it occurred. Accordingly, Jeffrey's convictions for endangering children are not against the manifest weight of the evidence, and we overrule his first assignment of error.

## B. Motion for new trial based on *Brady*

{¶ 46} In his second assignment of error, Jeffrey asserts that the prosecution failed to disclose favorable evidence to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. U.S.*, 405 U.S. 150 (1972). Specifically, Jeffrey alleges that the state failed to disclose that (1) Caswell saw Eli and Frank together during a Zoom conference at some point in the late spring or early summer of 2022, (2) in the late summer of 2022, the prosecution learned of Eli's arrest in Clark County for being in contact with Frank in violation of Sheila's 2020 CPO, and (3) Caswell contacted a prosecutor in Clark County to inquire whether Eli could be released on a summons pending arraignment.

{¶ 47} Under Crim.R. 33(A)(6), a defendant may move for a new trial "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial." The trial court's " 'decision to grant or deny a motion for a new trial on the basis of newly discovered evidence is within the sound discretion of the trial court and, absent an abuse of discretion, that decision will not be disturbed.' " *State v. McNeal*, 2022-Ohio-2703, ¶ 13, quoting *State v. Hawkins*, 66 Ohio St.3d 399, 350 (1993). However, when the movant alleges that the new evidence was

suppressed by the state, we must "appl[y] a due process analysis rather than an abuse of discretion test," because we are concerned with whether the lack of evidence deprived the defendant of the constitutional right to a fair trial rather than whether disclosure of the missing evidence would have resulted in an acquittal. *State v. Johnston*, 39 Ohio St. 3d 48, 60 (1988). When assessing a trial court's decision regarding a *Brady* claim, "we defer to the factual findings of the trial court while applying a de novo review of the trial court's application of the facts to the law." *State v. Walker*, 2022-Ohio-1684, ¶ 33 (10th Dist.).

{¶ 48} The state's failure to disclose evidence rises to the level of a due process violation if the evidence is "favorable to [the] accused" and "material either to guilt or to punishment." *Brady* at 87. Whether a piece of evidence is favorable and the extent to which it is favorable depends on context. *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) ("the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record"). Favorable evidence includes both exculpatory evidence and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Favorable evidence also includes evidence that affects a witness's overall credibility. *See Giglio* at 154.

{¶ 49} For evidence to be material, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley* at 682. A different result is reasonably probable if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* at 435. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Augurs*, 427 U.S. 97, 109-110 (1976). Additionally, evidence is not material if it is merely cumulative to other evidence presented at trial. *See State v. Hessler*, 2002-Ohio-3321, ¶ 53-54 (10th Dist.); *State v. Hill*, 2023-Ohio-1954, ¶ 34 (10th Dist.). Like favorability, the materiality of combined evidence will depend on the context of the record and the strength or weakness of the state's case. *See State v. Bethel*, 2022-Ohio-783, ¶ 34, quoting *Augurs* at 112 ("the materiality of suppressed evidence must be viewed 'in the context of the entire record' ").

{¶ 50} The defendant has the burden of proving that the state's suppression of evidence rises to the level of a denial of due process. *State v. Iacona*, 2001-Ohio-1292,

paragraph two of the syllabus. When evaluating the favorable nature of suppressed evidence, we consider each piece of evidence separately to determine if it is exculpatory or impeaching. *See Kyles* at 436, fn. 10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way."). And to determine the material nature of the evidence, we must consider the evidence collectively to determine its cumulative impact on the case. *Id.* at 436. When the combined evidence "has limited probative value in the context of the entire record," its suppression is unlikely to constitute a due process violation. *Bethel* at ¶ 40.

{¶ 51} Accordingly, we must first evaluate the individual favorability and then the cumulative materiality of the pieces of previously undisclosed evidence in this case—the brothers' contact around the summer of 2022 and Caswell's actions on the Clark County case in September 2022. To conclude that the suppression of this evidence violated Jeffrey's right to due process, we would need to determine that each piece of evidence was exculpatory or impeaching evidence, and that the evidence would have had the net effect of casting the state's case against Jeffrey in a different light in a way that would undermine confidence in the trial court's verdict for endangering children.

**1. The brothers' contact in the summer of 2022**

{¶ 52} At trial, the defense asked Frank various questions about his contact with Eli and other family members between the time of his removal from the Kesmans' home and the time of trial. Frank testified that although he witnessed the sheriff serving papers to Eli and Bella shortly before they left the Kesmans' home in April 2020, he did not know until later that the papers were CPOs. Frank said he did not know that the CPO forbade Eli from being around him "until [Eli] got picked up in Northridge about a couple months ago." (Jan. 30, 2023 Tr. Vol. I at 216.) Frank testified that after he was removed from Jeffrey's custody in April 2020, he first lived with Shade's brother and then with foster parents. He testified that once he was living at a foster home, he set up social media accounts and contacted Eli and other family members via social media and direct messages. The defense had the following exchange with Frank:

> Q: Okay. While you're setting up that Facebook account, I assume you befriend [Eli]; right?
>
> A: Yes, I friended him.

Q: You friend [Bella]?

A: I friended [Bella].

Q: You friend [Alice]?

A: Yes -- yeah.

Q: You friend [Caroline]?

A: Not at the time.

Q: Did you friend Shade?

A: Yes, I friended Shade.

Q: Okay. Now, if you guys were friends, you guys can then talk to each other; right?

A: Yes.

Q: And so, I assume, you're talking on Instant Messenger at that point?

A: Yes.

Q: How often would you say you're talking to them?

A: To who?

Q: The people I just mentioned, your family that you had friended.

A: I don't talk to [Alice] no more. I don't talk to [Caroline]; can't get ahold of [Bella]. [Eli], not so much -- at all, really.

Q: Would you say you talk to them less now and more after you first left?

A: Yeah, since this CPO has been put in place, but I'm going to get that dropped in February, so . . .

(Jan. 31, 2023 Tr. Vol. II at 314-315.) Frank also testified that after he turned 18 in September 2021 and left foster care, he spoke with Eli about his desire to live with Shade.

{¶ 53} At the August 2023 hearing on the Kesmans' motion for a new trial, Caswell testified that she saw Eli and Frank together during a video call in the summer of 2022 to discuss the upcoming trial. Madison Ward confirmed that the brothers appeared together for the video conference with Caswell, and she estimated that the video conference took place shortly before Memorial Day 2022. Ward, Flanagan, and Caswell all testified that Ward notified the prosecutor's office about Eli's alleged contact with Frank in September 2022, shortly after Eli was arrested for the CPO violation. Caswell testified that she did not

see the brothers together or hear of the brothers being together aside from the May 2022 video conference and Eli's September 2022 arrest.

{¶ 54} Jeffrey asserts that the evidence of the brothers' contact in late May and early September 2022 was favorable because it would have impeached Frank's testimony that he did not talk to Eli "much at all, really," prior to the Kesmans' trial. (Appellant's Brief at 45.) This court is skeptical whether evidence of two instances of contact between the brothers in the summer of 2022 would be inconsistent with a statement that there was not much contact between them. Jeffrey appears to concede that Frank's testimony does not directly conflict with the state's previously undisclosed evidence, given the testimony's "ambiguity," but he asserts that without the knowledge of the brothers' contact in the summer of 2022, "the defense had no reason to probe [Frank's] answer further." *Id.* at 46-47. Again, this court is skeptical about Jeffrey's claim, as the defense's above-quoted line of questioning was based on the knowledge that Frank was in contact with Eli via social media after the CPO was already in place. It seems that the defense already had some inkling that it could probe Frank's testimony about his contact with Eli between April 2020 and the time of trial.

{¶ 55} Jeffrey more generally asserts that the evidence of the brothers' contact in 2022 was favorable because it would have bolstered the defense's theory that the children conspired to fabricate their allegations against the Kesmans as retribution for the Kesmans' decision to remove Eli and Bella from the house and obtain CPOs against them. The evidence is certainly not *un*favorable, as the brothers would need to be in contact to conspire. However, evidence that the brothers were in contact in 2022 does not tend to prove that they fabricated their allegations any more than evidence that the brothers lived with the Kesmans in 2019 would tend to prove that the Kesmans endangered them. Moreover, the defense's opportunity to ask about collusion between Frank and Eli in the summer of 2022 appears to be cumulative to the opportunities the defense had to ask about collusion (1) between the two brothers during other known points of contact in 2020 and 2021, (2) between Bella and Eli in April 2020 when the alleged motive to fabricate arose, and (3) between Bella and either of her brothers throughout April 2020 to January 2023, given that there was no CPO prohibiting such contact.

{¶ 56} The evidence of the brothers' contacts in summer 2022 might have been helpful toward discovering evidence to support the defense's theory of collusive fabrication,

but it is not directly impeaching or inculpatory evidence. To the extent it can be considered favorable evidence for purposes of *Brady*, its favorable nature is limited.

### 2. The Columbus prosecutor's (Caswell) advocacy for Eli in Clark County

{¶ 57} Apart from Frank's oblique reference to Eli getting "picked up in Northridge[2] about a couple months ago" (Jan. 30, 2023 Tr. Vol. I at 216), there was no mention at trial of Eli's September 2022 arrest and CPO-violation charge in Clark County. In the Kesmans' motion for a new trial, they attached documents showing that Eli was arrested, processed, and booked around noon on September 9, 2022, and that Caswell contacted the Clark County Sheriff's Department about two hours later.

{¶ 58} According to a Clark County deputy's narrative report, Caswell provided information about the pending case against the Kesmans in Columbus and indicated that the Kesmans had filed the CPO to keep the children from each other. Caswell contacted the Springfield City Prosecutor's office to inquire about Eli being released on a summons awaiting arraignment rather than staying in jail. The state provided documentation showing that Eli stayed in jail until his arraignment. Upon arraignment, the Clark County Municipal Court released Eli on a recognizance bond. The municipal court's docket shows that the charge was dismissed, and the case was closed on December 8, 2022.

{¶ 59} At the August 2023 hearing on the Kesmans' motion for a new trial, Ward testified that once Eli was arrested, she called Flanagan, the domestic violence advocate assigned to the Kesmans' case in Columbus. Ward testified that Eli later told her that Flanagan "came down there and explained his situation" and that he was released on a recognizance bond. (Aug. 23, 2023 Tr. at 14.)

{¶ 60} Flanagan testified that Ward called her in a panic about Eli's arrest. She gave Ward the phone number for the Clark County Public Defender's office but said she was otherwise unable to help, as she was not an attorney. Flanagan immediately told Caswell about Eli's situation, but she did not communicate with anyone in Clark County about Eli's case.

{¶ 61} Caswell testified that she heard of Eli's arrest from Flanagan and called the police in Clark County to verify. She provided police and a local prosecutor with the background of the Kesmans' case, along with her view that the basis of the CPO was

---

[2] Northridge is a suburb of Springfield in Clark County, Ohio.

fraudulent. Caswell testified that she had no further interactions with anyone in Clark County about Eli's case. She testified that she did not inform Eli of her actions, let alone make any deal with him. As a more general matter, she stated, "In Municipal Court, we do not make the same kinds of deals that are made in Common Pleas." *Id.* at 91. She testified that at the time of the Kesmans' January 2023 trial, she did not know how long Eli ended up staying in jail, and she was not aware that Eli's case had been dismissed in December 2022.

{¶ 62} Jeffrey asserts that Caswell's advocacy for Eli in the Clark County case is favorable evidence because he could have used it to impeach Eli's credibility. He contends that he could have used the evidence to reveal that Eli was a biased witness with a motive to testify falsely in exchange for favors from the prosecutor's office.

{¶ 63} A party may impeach a witness by showing "[b]ias, prejudice, interest, or any motive to misrepresent." Evid.R. 616(A). A criminal defendant has "an unquestionable right" to present proof of bias to attack a witness's credibility. *Allen v. State*, 10 Ohio St. 287, 306 (1859). *See also United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."). One of the ways in which specter of bias arises is when the "possibility of a reward" gives a witness a "direct, personal stake in [the defendant's] conviction." *Bagley*, 473 U.S. at 683. A witness with a pending criminal charge " 'may be influenced by the expectation or hope that, by aiding in the conviction of the defendant, he might be . . . rewarded by leniency in the disposition of his own case.' " *State v. Drummond*, 2006-Ohio-5084, ¶ 104, quoting *State v. Hector*, 19 Ohio St.2d 167, 178 (1969). However, if the witness's charge is dismissed prior to his testimony, it is generally " 'irrelevant to credibility because the element of pressure is not there.' " *Id.*, quoting *State v. Gavin*, 51 Ohio App.2d 49, 54 (8th Dist. 1977).

{¶ 64} Eli's charge in Clark County was dismissed on December 8, 2022, almost two months before he testified at the Kesmans' trial. Apart from inquiring—in vain—whether Eli could be released on a summons pending arraignment, Caswell testified that she did not request anything from the Clark County prosecutor regarding Eli's case. The trial court found Caswell to be credible when she testified that she made no requests, and further that

she struck no deals and made no implicit or explicit promises to Eli regarding the Clark County case. We must defer to the trial court's factual findings regarding credibility. *State v. Geeslin*, 2007-Ohio-5239, ¶ 14. Considering the totality of the circumstances surrounding Caswell's involvement with Eli's Clark County case, the potential for bias appears to be attenuated at best.

{¶ 65} The totality of the circumstances surrounding Eli's own accusations against the Kesmans further undermine the possibility that Eli falsified his testimony in response to any alleged prosecutorial favors. A witness can rebut an accusation of false testimony due to bias by showing that the witness made consistent statements " 'prior to the time of the suggested invention or of the emergence of the motive or influence to invent or falsify.' " *State v. Spence*, 2006-Ohio-6257, ¶ 83 (10th Dist.), quoting *Motorists Mut. Ins. Co. v. Vance*, 21 Ohio App.3d 205 (10th Dist. 1985), paragraph one of the syllabus. Eli's allegations in his 2023 testimony against the Kesmans were substantially the same as the allegations he made in his statements in 2020. Given that Eli was consistent in his accusations before and after his Clark County proceedings, proof of Caswell's actions would not make the truth of Eli's accusations any more or less probable. *See Abel*, 469 U.S. at 51 ("A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the [factfinder] than it would be without such testimony.").

{¶ 66} The evidence of Caswell's actions regarding Eli's Clark County case certainly had potential impeachment value and was therefore favorable evidence for *Brady* purposes. However, the full context of Caswell's actions and of Eli's consistent accusations significantly dampened the impeachment value of the evidence.

### 3. The cumulative effect of the suppressed evidence

{¶ 67} Finally, we determine whether the evidence of the brothers' 2022 contact and Eli's Clark County case was material. Although each piece of undisclosed favorable evidence might not be material to a defendant's guilt when standing alone, it is possible that the combined effect of the evidence is material and warrants a new trial. *See Kyles*, 514 U.S. at 437. We find no such combined effect in this case. As explained above, each piece of undisclosed evidence had negligible impeachment value at best. Further, the evidence of the contact between the brothers in the summer of 2022 and Eli's Clark County

case in the fall of 2022 supported alternative theories of bias and fabrication rather than one combined theory. The defense's new theory that Eli falsified his 2023 testimony due to prosecutorial influence in 2022 would undermine rather than enhance the defense's theory at trial that the children fabricated their accusations in April 2020 as revenge for the Kesmans' CPOs against Bella and Eli.

{¶ 68} We conclude that the evidence of contact between the brothers in the summer of 2022 and of Caswell's subsequent call to the Clark County Prosecutor's office does not reasonably put Jeffrey's whole case in such a different light as to undermine the confidence in the trial court's decision on the ultimate issue of whether Jeffrey was guilty of endangering Bella, Eli, and Frank in 2019 and 2020. Accordingly, we overrule Jeffrey's second assignment of error.

## C. Motion for new trial based on other newly discovered evidence

{¶ 69} In his third assignment of error, Jeffrey asserts that the trial court's denial of the Kesmans' motion for a new trial was an abuse of discretion in light of the new evidence provided in support of the motion. Specifically, Eli's newly ex-fiancée, Madison Ward, testified that Eli and Frank discussed and coordinated their testimony before and during trial.

{¶ 70} Jeffrey does not allege that the prosecution was aware of Ward's knowledge about the brothers' conversations before or during the January 2023 trial, and thus, Ward's testimony regarding such activities does not implicate *Brady*. When a *Brady* violation is not involved, the trial court's decision on a motion for a new trial based on newly discovered evidence is subject to the regular abuse of discretion standard of review. *Hawkins*, 66 Ohio St.3d at 350. A trial court abuses its discretion "if there is no sound reasoning process that would support [its] decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 71} A successful motion for a new trial based on newly discovered evidence requires that the new evidence " '(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.' " *State v. Grad*, 2024-Ohio-5710, ¶ 38, quoting

*State v. Petro*, 148 Ohio St. 505 (1947), syllabus. The requirement of showing a strong probability of a different result is a more severe burden than the requirement of showing a reasonable probability of a different result under *Brady*. *State v. Johnson*, 39 Ohio St.3d 48, 60 (1988).

{¶ 72} During Ward's testimony at the hearing on the Kesmans' motion for a new trial, she stated that Eli and Frank communicated prior to trial to "get their stories straight." (Aug. 23, 2023 Tr. at 15.) Specifically, she testified that they would discuss how they ate peanut butter sandwiches, and when Frank mentioned eating dog food, Eli told him to "stick to the sandwich, not the dog food." *Id*. at 16. Ward testified that during the Kesmans' trial, Frank texted Eli to explain that he had to return to testify a second day, and that he testified that the children ate sandwiches and not dog food.[3] When asked what Eli had personally told her about his childhood with the Kesmans, Ward testified that Eli said he was locked in a room, physically abused, not fed enough, not allowed to go to school, not allowed to regularly bathe or use the restroom, and forced to sit on his knees on a vent as a form of punishment. When asked about what Frank personally shared with her about his childhood with the Kesmans, Ward said that Frank's description of his childhood matched Eli's description.

{¶ 73} Ward also testified that she was no longer in a relationship with Eli, that she has a domestic violence case pending against him, and that she has a bad opinion of him. She also testified that she had a terrible memory; when asked if she could place three significant life events in order—meeting Eli, having a child, and the Kesmans' trial—Ward said she could not do so. From this context, the trial court concluded that Ward was not a credible witness. Even taking Ward's testimony into account, the trial court noted that her description of the brothers' childhood experiences was consistent with the brothers' testimony at trial. The trial court concluded that even if Ward had provided the same testimony at the January 2023 trial, and even if the court had known of the brothers' contact in the summer of 2022 and Caswell's actions regarding Eli's Clark County case in the fall of 2022, the information would not have changed the court's view of the brothers' trial testimony.

---

[3] We note that at trial, both Eli and Frank testified about eating dog food as well as being fed peanut butter sandwiches.

{¶ 74} When the trial court presides over both a motion for a new trial and the trial itself, the court "is in a peculiarly advantageous position" as it "has the benefit of observing the witnesses at the time of the trial . . . and can often discern and assay the incidents, the influences, and the motives" that led to the new evidence. *Taylor v. Ross*, 150 Ohio St. 448, 452 (1948). And where, as here, the trial court itself was the factfinder in the original trial, it "is in the best possible position to determine whether the conclusion as to [the defendant's] guilt or innocence would be likely to be affected by the newly discovered evidence." *Dayton v. Martin*, 43 Ohio App.3d 87, 90 (2d Dist. 1987). We will not second guess the trial court's determination of Ward's credibility, and we conclude that the trial court used a sound reasoning process to determine that the new evidence would not change the trial court's verdicts. Although the new evidence was relevant to the brothers' general credibility, none of the evidence indicated that the brothers testified falsely about how the Kesmans treated them in 2019 and 2020. When Ward was given the opportunity to explain what Eli and Frank *really* said about their childhood, she provided an account that confirmed the brothers' trial testimony and therefore tended to show that their testimony was truthful.

{¶ 75} The evidence that Jeffrey presented in support of his motion for a new trial did not undermine Eli and Frank's credibility to the point of evidencing a strong probability that it would change the result of Jeffrey's trial. We conclude that the trial court did not abuse its discretion when it denied Jeffrey's motion for a new trial, and we therefore overrule Jeffrey's third assignment of error.

## IV. Disposition

{¶ 76} Having overruled Jeffrey's three assignments of error, we affirm the judgment of the Franklin County Municipal Court.

*Judgment affirmed.*

JAMISON, P.J., and BEATTY BLUNT, J., concur.

———————————